SABIN v. NORTHWESTERN LEATHER CO.

MASTER AND SERVANT — WARNING AND INSTRUCTING EMPLOYÉ — DEFECTIVE MACHINERY—ASSUMED RISK.

Negligence, the risk of which a servant does not assume, is inferable from evidence that a polishing machine on which plaintiff, a boy of sixteen, was working, suddenly and unexpectedly caught leather which he was polishing, jerking the plaintiff into the machine; that although it had jerked at previous times as other machines did, it was worse than the others and got out of order more frequently, and that although the defects were known to the plaintiff, he had received no warning concerning the danger, or instructions how to avoid it.[1]

Error to Chippewa; Steere, J. Submitted February 17, 1909. (Docket No. 103.) Decided July 15, 1909.

Case by Roy Sabin, by next friend, against the Northwestern Leather Company for personal injuries. A judgment for plaintiff is reviewed by defendant on writ of error. Affirmed.

*Fred L. Vandeveer* (*Horace M. Oren*, of counsel), for appellant.

*Sharpe & Handy*, for appellee.

OSTRANDER, J. There are two counts in the declaration. In the first it is alleged that the defendant—

"Negligently set the plaintiff to work on said machine without instruction as to the safest and best methods of handling such work and neglected to warn him of the dangerous condition of the said machine, and unreasonably required the plaintiff to finish 1,000 hides per day, and failed and neglected to keep said machine in reasonable repair, but permitted the same to get out of repair in

---

[1] As to master's duty to warn and instruct servant, see note to *James* v. *Rapides Lumber Co.* (La.), 44 L. R. A. 33.

such a manner that the undersurface of said polisher was uneven and rough, and the pressure of the polisher upon the leather as it passed through the said machine varied greatly, and became much greater at some times than at others, with the result that the motion of the said polisher and its coming in contact with the leather in the hands of the plaintiff had the effect to jerk the leather violently, by reason of which on, to wit, the day and year aforesaid, without any fault or negligence on the part of the plaintiff, and while he was carefully attending to his duties as usual, the leather in the hands of plaintiff suddenly received a violent jerk, and plaintiff was jerked or thrown suddenly forward, and his left hand was caught by the said machine," etc.

In the second it is alleged that:

" The machine on which plaintiff was put to work consisted of a flat surface or table, and above and suspended over such table an iron smoothing and polishing apparatus, hereinafter called the polisher, attached to and operated by an arm, so connected as to give such polisher a rapid rotary motion, such motion raising the polisher from the table a few inches, bringing it forward towards the person in charge, then dropping it upon the leather as it lay upon the table and then drawing the polisher away from the operator along the surface of the leather, the friction drawing such leather gradually through and under such polisher, and by means of the person in charge holding such leather in his hands and guiding the same, such leather was gradually exposed to the action of such polisher until the whole surface thereof was smoothed and polished, when it was removed and another hide substituted.    It was well known to defendant that the machine on which plaintiff was put to work was not in good repair, and was defective in its construction, so as to render it dangerous to work upon, and would frequently get out of repair very suddenly, in such a manner that the friction of the polisher upon the leather in the hands of the operator was suddenly greatly increased, and the machine would jerk the leather violently and suddenly, sc that, either the leather would be jerked out of the operator's hands, or, if the operator had a firm hold upon such leather, he would be jerked forward towards such machine.    Plaintiff alleges that it was the duty of the defendant to repair or rebuild such machine, and to place

the same in reasonably safe condition to operate, and to warn the plaintiff of the dangerous condition of such machine, and instruct him how to operate the same safely, and warn him of the danger of being jerked forward by such machine, and getting his hands into said machine, yet the said defendant, well knowing the premises, failed and neglected to perform its said duty to plaintiff, and failed and neglected to rebuild or repair the said machine so as to render it safe for use, and failed to warn plaintiff of the dangerous condition of said machine, and failed to warn plaintiff of the danger of being jerked towards or into said machine, and how to guard against the danger of being drawn or jerked into said machine, by reason of which the plaintiff, without any fault or negligence on his part, and while engaged in his usual duties in running such machine, was suddenly jerked forward by the unusual friction of such machine, and plaintiff's fingers of his left hand were caught in such machine," etc.

If defendant was negligent in not instructing the plaintiff, it was because there was something peculiar about the particular machine, something in its condition, or in the manner in which it performed, which raised the duty to give other or further instructions than were required to be given to one operating a like machine in good repair. It is therefore necessary to examine with care the testimony concerning the condition of the machine and the way it performed in operation.

There is no testimony tending to prove that the "undersurface of said polisher was uneven and rough." There is no testimony tending to prove that the machine was defective in construction, or that it was out of repair in the sense that any necessary part was wanting or was imperfect.

The machine, called a jack, was one of seven; was of standard make; adapted to the purpose for which it was used. It was used to smooth and polish hides of leather called "splits." In its operation an arm carrying at its head a plate, called the polisher, moved towards the front of the machine, descended to and struck an inclined

bolster, and was drawn backward and downward for a distance, when it was lifted and the movement was repeated. The movement was constant, and is described as at a rate of 150 revolutions a minute. A hide was thrown by the operator over the bolster, and over a table which surrounded it on three sides, and the pressure of the polisher upon the leather smoothed it. The operation involved such movement and manipulation of the hide when the arm was lifted and was advancing that its entire surface was passed over the bolster and under the polisher. Some hides were rougher than others; in some were holes, rough spots, and some hides were from branded cattle. The pressure of the polisher upon the hide being otherwise constant, the friction caused by the passing of the head or polisher over the leather would be, in some degree, variable as thick and rough places in the leather were encountered. The tendency at all times was to pull the hide away from the operator towards the back of the table in the.line of the descending, polishing strokes of the arm. With a perfect machine, perfectly adjusted, there was the danger, the principal and obvious risk of the employment, that the swiftly moving polisher would be brought into contact with a rough spot, a brand or scar, or a hole in the leather, jerking the operator if he maintained his hold upon the hide towards the machine, and, according to the position in which he stood, towards the moving arm. ·

Plaintiff testified:

"Some of the leather would be rough. Sometimes there would be a hole or place where it was branded. If the polisher happened to get on that, that would jerk it. When that would jerk, I had to let it go, and go around and pick it up. The reason that I would let it go was because it would jerk away from me, it would flop out of my hands. * * * If the leather was jerked, I would turn loose of it, so as not to get caught. This would happen occasionally every day, and sometimes two or three times an hour. When I first started to do this work, I did not try to hold on to the leather. I did not try because there was too much power there. I could not hold it, because

it was being pulled away with so much strength, and my strength was not equal to holding it. I realized that I would have to turn loose of it, and simply turned around and picked it up. I realized that, if I held on, I might be drawn in, and for that reason I turned loose. I knew of this before the accident. * * * This work that I was doing, feeding this in, was a comparatively simple operation. You had to be quick about it and dexterous. As soon as I got through with one hide, I would take another. You would have to place it on the horse and reach over on the other side and get another one. Outside of the fact that occasionally one of these would be pulled out of my hands, I got along all right."

Describing the manner of his injury, he said:

"I think at the time I received the injury, I had a hide about half dressed, half polished. There was not anything at all on that hide in the way of peculiar places that I saw. I do not know why this machine jerked at that particular time. It jerked a good deal harder on that occasion than I had ever had it jerk before. I had no preliminary warning before that. The jerking had not increased before that, leading up to this. It had been running about as usual. I do not know now as to just what caused that jerking. I know that the machine previously had acted so that it would jerk away a hide, and had to be adjusted. I never had my fingers pinched before. * * * At the time that I got hurt I was working the leather around. I had a side of leather in the machine. When I was working this leather around in the machine, this jack gave a jerk, and I had a grip on it, and it jerked so hard and jerked my weight over on it, and I did not have time to get back out of the road, and it caught my two fingers, and it pulled them two fingers off, and pulled my arm in front of the machine, and it came back again, and smashed my arm, and in coming back my head was right beside it, and it shoved me about 10 feet away from the machine."

Plaintiff also testified that, upon being told that he might operate this machine, he oiled it, set it in motion, and operated it for some 45 minutes, putting through 25 hides, before the foreman had opportunity to instruct him in its use. He said:

"I knew that the leather did jerk occasionally. I found that out from my experience in the first 45 minutes. After he gave me that instruction, I still had some trouble by it still jerking before I caught on just how to operate it. I have no idea how many hides it jerked with me that day. There were several times every hour. The longer I worked at it the more proficient I became."

Plaintiff was 16 years old, and had no previous experience. He began work on Monday, March 11th, and was injured on Monday, March 18th, at about 11 o'clock in the forenoon. He operated no jack other than the one at which he was set to work. He had put through, when injured, about 5,000 hides. The testimony for plaintiff also tends to prove (what would seem to be a self-evident proposition) that in operating the other jacks the same difficulty, in kind if not in degree, was met with. The hides were pulled away from the operator by the descending, polishing stroke of the arm. There is testimony tending to prove that the bolsters on all of the machines worked up, causing an increasing pressure of the polisher upon the hides. This was remedied by some adjustment of the machines. There is also testimony that the particular machine jerked worse than the other machines, required more frequent adjustment, and that the adjustments made after plaintiff began to operate the machine were made at irregular intervals. Upon this subject the plaintiff testified, in part, as follows:

"There were times when this machine jerked so much that I went to the foreman and asked him to fix it. He repaired this machine on Monday, the first day I was there. He took it apart, and I think on Tuesday he adjusted the screw, and he did not touch it again until Thursday, and he took and adjusted the screws again. From Thursday until the day I was hurt, it was not touched, was not changed at all, as I recollect. He made these repairs when I went to him and told him about its jerking. The time I went to him and told him about this the machine was acting rough and jerking away from me, jerking so hard that I could not do anything with it. * * * I went over to Mr. Faulkner, and made some

complaint to him about the machine. The nature of my complaint was that it was jerking from me. It jerked so that I could not hold it at all, and strong enough to jerk it away from my hands. Mr. Faulkner went over and made some adjustment on the bolster. He did not do anything to the arm or polisher. The only adjustment he made was to the bolster underneath. On Monday he re-paired it, and on Tuesday he adjusted it, and I think it was the following Thursday he adjusted it again. He handled some set screws underneath. The last time he did that was Thursday in the forenoon, about 10 or 11 o'clock, or something like that. I worked on the machine all the rest of Thursday and Friday and Saturday and up until 11 o'clock Monday morning. During that time I made no complaint about it. It was all right up until I got hurt, when suddenly something happened, and the jerk occurred and my hand was pulled in."

Plaintiff was not taught, indeed was forbidden, to adjust the machine. He also testified, not always consistently:

" If there was a rough place, and I tried to polish it, the leather would be jerked. I knew that if the leather was jerked, and I had hold of it and did not turn loose, my hand would be jerked too. I knew if my hand was jerked forward, it might be caught. * * * Sometimes this leather would be jerked out of my hands when it would get caught on rough places; that is, when the polisher would catch on rough places. I never had it catch on a brand. I do not mind of its catching on a rough place. Sometimes when I had a smooth piece of leather it would jerk. * * * I did not get any instruction as to what to do about rough places being in the leather, how to polish those. When there were rough places to get around them, I had to skip them. I had to do so because I could not polish them, it would pull out of my hands. When I got a piece of leather with rough places in it, and the polisher was over them, it would pull it out of my hands. I do not know whether it did this the first day I worked the jack. It happened a number of times before I got hurt, so I came to the conclusion I could not polish the rough places. The reason I could not was because the polisher would jerk it out of my hands. * * * When the polisher would jerk, my hands would not go forward. It would jerk it out of my hands. My hands would go a

trifle forward. I knew without being told that I was not able to polish the rough places; that the leather would be jerked away from me. At some times my hands would be within four inches of the polisher. I did not realize that if I did try to do one of those rough places and was caught, and my hands were within four inches, there was a possibility of my hands being drawn in if I did not let loose. I knew that I could not do it. I did not realize that, if I held on to it, and that if my hands were within four inches of the polisher, my hands would get in. I did not think there was any danger of that at all. * * * I found out from using this machine that it jerked the leather occasionally and quite often, and sometimes it jerked quite hard. Sometimes I could not jack a hide and I had to give it to the boy next to me."

It will be perceived that, accepting plaintiff's version of the facts, the case is a very close one. But we are not able to say, as matter of law, that the testimony fails to show that this machine had habits, peculiarities, of which the employer was, or ought to have been, aware, with respect to which the plaintiff should have been advised. It is said in argument that in the six days he operated the machine successfully plaintiff had run the gamut of experience, and had learned, without being told, the habits of the machine. We do not assent to this because we think there is testimony supporting the conclusion that the machine was eccentric, erratic. No other reason is suggested for the fact that plaintiff was sometimes obliged to give to an operator of a like machine a hide which he had tried unsuccessfully to treat with his own machine. Nor can the age and inexperience of the plaintiff be wholly ignored in determining whether, with the instructions and demonstrations which were given him, he appreciated the risks attending the operation of this machine.

We hold, though with considerable reluctance, that the court was not in error in refusing to direct a verdict for the defendant. No other question is raised by the assignments of error. The judgment is affirmed.

HOOKER, MOORE, MCALVAY, and BROOKE, JJ., concurred.