WIGHT v. MICHIGAN CENTRAL RAILROAD CO.

1. RAILROADS—EQUIPMENT—NEGLIGENCE—STATUTES.
    Freight cars equipped with coupling devices upon each end, with levers at two diagonal corners, to permit coupling without entering between cars, conform with the requirements of 2 Comp. Laws, § 5511, although each of the levers extends to only one side.[1]

2. EVIDENCE—JUDICIAL NOTICE—ACTION BY STATE OFFICIALS.
    The court may take judicial notice that no actions have been begun by the commissioner of railroads to recover penalties because cars so made are not lawfully equipped.

3. RAILROADS—NEGLIGENCE—DEFECTIVE APPLIANCES.
    Testimony that a coupling device failed to work when plaintiff tried to work it, and immediately thereafter when the conductor attempted to operate it, tends to show that the device was defective at the time of plaintiff's injury.

4. SAME—STATUTES.
    The test of conformity to the statutory requirements is not whether the device is provided, but whether the cars can be

[1] As to duty and liability under Federal and State railway safety appliance acts, see note to *Chicago, etc., R. Co.* v. *United States* (Fed.), 20 L. R. A. (N. S.) 473.

coupled and uncoupled by it: the duty to equip being absolute, as well as the duty to start no car without an operative equipment.

5. MASTER AND SERVANT — CONTRIBUTORY NEGLIGENCE — RAILROADS.

Negligence contributing to his injury is chargeable to a brakeman who attempts to uncouple cars by using his hand to reach the coupling pin, knowing the liability to have it crushed, where a coupling device on one car failed to operate, and he could have safely and effectively used the device on the other car.

6. SAME—EXPOSURE TO DANGER—CHOICE OF MEANS.

One who voluntarily and unnecessarily exposes himself to an imminent known danger, and so contributes to his injury, cannot escape the consequences because the negligence of another concurred in producing the injury.

7. SAME.

Where there is a comparatively safe and a more dangerous way of discharging a duty, it is negligence to select the more dangerous.

Error to Cass; Des Voignes, J.  Submitted June 18, 1909.  (Docket No. 34.)  Reargued January 4, 1910. Decided May 7, 1910.

Case by George F. Wight against the Michigan Central Railroad Company for personal injuries.  A judgment for plaintiff is reviewed by defendant on writ of error. Reversed.

*Victor M. Gore* (*Henry Russell, O. E. Butterfield,* and *Frank E. Robson*, of counsel), for appellant.

*M. L. Howell* and *D. D. Bates*, for appellee.

OSTRANDER, J.  The declaration of the plaintiff alleges the duty of the defendant and the breach thereof, in the following language:

"And it was then and there the duty of the defendant to have the cars in said train so equipped with some form of coupling device that said cars could be uncoupled from

either side of said train without the necessity of going between the cars, and to have upon such cars such sufficient coupling device as to have enabled the plaintiff to uncouple any two of said cars from either side of the train without going between them. Yet the defendant wholly disregarded its said duty, had in said train two certain cars * * * which could not be uncoupled except by going between said cars, of which the defendant had notice, but of which the plaintiff was wholly ignorant. And the plaintiff avers that on said day * * * it became the duty of the plaintiff to uncouple said two cars, and to do so, because of said neglect of duty by defendant, he was wrongfully and illegally compelled to go between them to pull the coupling pin by hand and so uncouple said cars, * * * " in doing which and without negligence on his part he was injured.

No reference is made to any statute. Assuming the declaration to be sufficient to sustain a judgment based upon testimony of an initial equipment of the cars with a coupling device designed to meet the duty imposed by 2 Comp. Laws, § 5511, and of a failure of the device, upon the particular occasion, to operate as it was designed to operate, the important questions presented are whether it can be said as matter of law (1) that defendant was not negligent; (2) whether plaintiff was guilty of negligence contributing to his injury.

The cars in question were foreign freight cars, received and inspected by defendant on the day plaintiff was injured, and placed in and made part of a regular freight train of some 20 cars which left Jackson, Mich., at about 2 o'clock in the morning. The undisputed testimony is that both cars were equipped with coupling devices designed to permit them to be coupled and uncoupled without the necessity of going between the cars. These devices were upon each end of each car; the extended levers by which they were designed to be operated being at corners of the car diagonal to each other. When two cars were coupled together, they could be uncoupled from either side, but not by the use of the same lever. Unless we are to hold, as it is intimated in the opinion of Mr.

Justice MOORE we should do, that the device for uncoupling upon each end of each freight car must, in order to conform to the statute, be capable of operation from each side of the car, then it is conclusively established by the testimony that these cars were equipped as the statute requires, that from either side by use of an apparatus upon one car or the other the cars could be uncoupled provided the device was in working order, and, if one was defective, or for any reason did not perform as designed to perform, the release of the same cars could be effected by the use of the lever upon the other car from a position upon the other side of the train. I find nothing in the record justifying the conclusion that the device itself did not conform with the statute requirement. That it is in common use on cars within and without this State is undoubted. We may take notice that no actions have been begun by the commissioner of railroads to recover penalties because cars equipped with such a device are not lawfully equipped.

Considering the testimony most favorable to the plaintiff, it appears that he tried to pull the coupling pin on one of the cars by the use of the device attached to the end of that car, and was unable to do so. The plaintiff signaled to the engine for "slack," and, when the engine and the cars came back, he used the lever, and was unable to pull the pin. The conductor of the train testified also, that after plaintiff was injured he tried, without success, to operate the lever. Why it would not operate is wholly unexplained. How long it had been in the condition in which plaintiff found it is not shown. When it had last been used with success, or whether it had ever been operated, is not shown. It cannot be said, as matter of law, there was no testimony tending to prove that the device was defective at the time plaintiff attempted to use it. In view of the character of the inspection which was made of this car at Jackson, it cannot be said, either, that the defendant was not guilty of a violation of the statute in running this car. The inspection proven was one

which did not extend to actual operation of the device. The statute says that no freight car shall be run unless furnished with safety couplers as provided in the act. The test is not whether a device is provided, but it is whether the cars can be coupled and uncoupled by its use. The duty to equip is an absolute one, and so, I think, is the duty to start no car upon a journey without an operative equipment. We are not, however, called upon to decide, and therefore should not decide, whether the fact that such a device does not upon a particular occasion perform is of itself under all circumstances conclusive proof of a violation of the statute.

Assuming that a breach of defendant's duty is made out, there is an insuperable difficulty to sustaining the judgment for the plaintiff, arising from the undisputed evidence of his own want of ordinary care. It is the undisputed testimony that, after plaintiff had been injured, the conductor of the train, without going to the other side of the train, but by mounting and standing upon the dead ends or deadwoods of the car, and, without signaling for "slack," pulled the pin plaintiff tried to reach with his hand by using the device, or a portion of it, upon that car. He then signaled that the cars were uncoupled, and the engine, with the cars attached to it, went up the hill. When it returned for the other cars, it was coupled to the car where the uncoupling had been accomplished. The train of cars in question was stalled. The testimony, undisputed, is that the rear of the train was held by brakes and a man sent to the rear to protect the train. It was stationary, except as the slack permitted movement, until a portion of it could be cut off, when the forward cars would be taken over the hill. Plaintiff knew that the car next the one having the defective or nonworkable device was also equipped with a similar device. He knew the purpose of such devices. He testified:

"*Q.* And you knew if you stuck your hand in between those deadwoods you were liable to have it mashed, didn't you?

"*A.* Why, certainly."

He made no effort to use the device upon the other car. Clearly there was a comparatively safe way and a very dangerous way known to him, and he selected the more, and the most, dangerous method. It was a way so dangerous that the legislature of the State and the congress of the United States have made it the duty of railroads to provide an equipment by which cars can be uncoupled " without the necessity " of going between the cars. He is relying, in this action, upon the duty imposed upon the master without regarding the correlative duty resting on himself to use the equipment provided for his safety. More than this, he was experimenting. His testimony clearly shows that he did not know that with his hand upon the pin he could give a signal which could be seen by the engineer. He bases his claim of necessity for his action upon the fact that, as the train was on a curve, he could not have made signals if using the lever on the opposite side of the train. But he did not try to do what the conductor later did, uncouple and then signal. He did not call the conductor to signal for him, if it was found to be necessary to signal.

In the opinion of Mr. Justice MOORE, it is said that from the testimony of the plaintiff it is clear—

" That the only way the car could be uncoupled from the side of the train upon which he stood was to do just what he attempted to do. It should not be forgotten that this train was not stalled in a yard, but it was stalled between stations and blocked the only track between stations, and no train could pass until this train continued its journey, and its continuing on was important. The whole situation was before the plaintiff. He was in a difficult situation."

In my opinion these considerations are wholly insufficient to justify or excuse the conduct of the plaintiff. On the contrary, if they are permitted to excuse him and others like him who follow convenience into places of greatest danger, who with almost incredible temerity choose to risk limb and life without necessity, courts will

have done little to effect what the legislatures have made possible, will have done little to make simple such situations as the one in which plaintiff was placed. In view of the argument referred to, I call attention to what, in fact, happened. The locomotive was used to convey plaintiff to a place where he could be cared for, the train meantime occupying the track. These were inevitable consequences if he was injured. The rule that one who voluntarily and unnecessarily exposes himself to an imminent, known danger, and so contributes to his injury, cannot escape the consequences because the negligence of another concurred in producing the injury, and the rule that, where there is a comparatively safe and a more dangerous way of discharging a duty, it is negligence to select the more dangerous, are salutary, and have long been applied by the courts. They have been applied in cases almost precisely like this one. *Morris* v. *Railway Co.*, 108 Fed. 747, 47 C. C. A. 661; *Gilbert* v. *Railway Co.*, 63 C. C. A. 27, 128 Fed. 529. They should be applied here. Applying them, we are required to say as matter of law that plaintiff has not shown himself free from negligence which contributed to his injury. If by any possibility it can be said that the question of his negligence was for the jury, it was error to instruct the jury that—

"The plaintiff was not required to go on the other side of the train to avoid going between the cars, if he could not from such other side signal the person on the engine."

The judgment is reversed, and a new trial is granted.

HOOKER, BROOKE, and STONE, JJ., concurred with OSTRANDER, J.

McALVAY, J. I concur on the ground of contributory negligence of plaintiff.

BLAIR, J., concurred with McALVAY, J.

MOORE, J. (*dissenting*). The plaintiff was injured in an attempt to uncouple cars having double deadwoods. Upon a trial before a jury he recovered a substantial

verdict.   The case is brought here by writ of error. The declaration charges that the defendant failed in its duty to provide an uncoupling device as required by the statute, and that because of such omission the plaintiff, while in the exercise of due care, was injured.   The plaintiff had served as brakeman four years.   The train was made up of about 20 cars.   The train stalled on a heavy grade.   The plaintiff, as head brakeman, went back to cut the train so the engine could move it in sections up the grade.

The plaintiff testified that he tried to uncouple the cars by the use of the uncoupling device; that he tried the lever two or three times, and could not lift the pin.   His version of the transaction is as follows:

"Did you try, then, after cutting the train in two, did you undertake to cut off another car?

"A. Yes; I was going to cut off another car, and the engineer didn't think he could make it with that one off, so he motioned me to cut two off, and I cut the other two off and couldn't do it.

"Q. You say you couldn't do it.   Why couldn't you do it?

"A. The lever that should work wouldn't work, and, while reaching over to get hold of the pin on the other one, the slack run back on me and caught my arm between the dead irons.

"Q. What kind of dead irons were on these cars?

"A. Square dead irons.

"Q. Describe to the jury about those dead irons, what they are, and how they are, and why you had to reach with reference to them to get your car uncoupled.

"A. They are irons about, I should judge, a foot square, ten inches, anyway, between ten inches and a foot square, and they come up close together on each side.   There is one on each side of the coupler.   And, when they come together, they come together tight enough to pretty near cut a newspaper in two.   And, when I couldn't work this pin, I was forced to reach over to get hold of the other pin in order to cut them cars where I did cut them.

"Q. Was there any way to lift the pin except by your hand?

"*A.* That is the only way I could raise it, by reaching over there with my hand.

"*Q.* Could you get your hands to the pin without getting between the cars?

"*A.* Oh, no, no.

"*Q.* Could you get your hand to the pin without getting your arm between the double deadwoods?

"*A.* No.

"*Q.* When you had your arm in there to get off one of those pins, which pin were you trying to get? The one that should have had the lever on, or the one on which the lever was and would not work?

"*A.* I was trying to get the one that the lever didn't come across to me.

"*Q.* The one that had the lever on would not pull with the lever?

"*A.* Wouldn't pull.

"*Q.* You may state whether or not they sometimes get in that fix so they won't pull.

"*A.* Several times.

"*Q.* Now, these cars slacked back on you and smashed your arm.  *  *  *  In what condition was your arm in then?

"*A.* It was all crushed at the elbow.  *  *  *  It was not an extraordinary thing for me to couple cars that had deadwoods. I understand how to couple them and uncouple them, and did while I was working on the line between Battle Creek and Goshen. I had uncoupled a great number of them I presume that year.  *  *  *

"*Q.* But your business called on you to couple cars and uncouple cars?

"*A.* Yes, sir; I had been doing that service during these years, and I had continued to couple and uncouple cars having deadwoods.

"*Q.* So, you were familiar with the deadwood coupling?

"*A.* Well, they aint so plenty. You don't see them every day.

"*Q.* I know, but you were familiar with them?

"*A.* Oh, yes; I have had them on the trains I have been on. I have coupled them and uncoupled them, so that it was not an unusual proposition to me to uncouple them or couple them.  *  *  *

"*Q.* What did you do when you got there?

"*A.* Well, the first thing I done I cut the air, and then I took hold of this—

"*Q.* (interrupting).   You cut the air?

"*A.* I cut the air.

"*Q.* Then what did you do?

"*A.* Took hold of the lever, and got the slack, and I couldn't pull the pin.

"*Q.* How did you get the slack?

"*A.* I motioned for him to give me the slack.

"*Q.* Motioned the engineer to give you the slack?

"*A.* Yes, sir.

"*Q.* And then you tried this lever?

"*A.* Tried this lever, and couldn't make it.

"*Q.* You tried them with both hands?

"*A.* Yes, sir.

"*Q.* Did you try them thoroughly?

"*A.* Yes, sir.

"*Q.* How many times would you say you tried to lift it?

"*A.* Oh, I should judge three times.

"*Q.* You were satisfied that you could not lift that pin with that lever?

"*A.* Yes, sir.

"*Q.* And you had the slack as you wanted it?

"*A.* Yes, sir.

"*Q.* You fully understood at that time that you were unable by the use of the lever to lift that pin?

"*A.* Yes, sir. * * *

"*Q.* You knew you could step to the side of the car as easily there as from any point?

"*A.* I couldn't step to the car and give him a signal, and hang on to the pin at the same time.

"*Q.* How did you expect to do that by reaching your arm in between the deadwoods and getting hold of the pin?   Answer fully.

"*A.* I expected to reach over the deadwoods.   I hadn't got hold of the pin when the slack came back and caught me.   The slack came back, and caught me without any signal at all.

"*Q.* You know slack is likely to come back on a freight train?

"*A.* No; I don't, when the engine is pulling on it.

"*Q.* You have frequently known slack to come back?

"*A.* Yes, sir.

"*Q.* You know it is liable to do that on a grade?

"*A.* It is liable to, but the engine was holding it.

161 MICH.—15.

"*Q.* Even though the engine is holding it the slack is liable to come back, and you know that?

"*A.* No; not when the engine is pulling.

"*Q.* But, if there was slack between your position and the engine, you knew it was liable to come back?

"*A.* Why, it is liable; yes.

"*Q.* And you knew, if you stuck your hand in between those deadwoods, you were liable to have it mashed, didn't you?

"*A.* Why, certainly. * * * The train was on the curve at the time this occurred. I was on the inside, so that both ends of the train could be seen by looking out, and both ends could see me. That is why I went to the inside of the curve, so I would be in sight and give the signal from there.

"*Q.* I will ask you the further question: Can the engineer or had the engineer any authority or right to slack back until you told him to by your signal?

"*A.* No. The engineer and the uncoupling were under my orders.

"*Q.* And, when you went in to uncouple, you had a right to believe that he would not slack back except on your signal?

"*A.* On my signal. * * *

"*Q.* So you say the engineer caused the cars to come back and crush your arm?

"*A.* I say he must have caused it because they came back with such main force.

"*Q.* Well, that is your claim?

"*A.* Yes, sir.

"*Q.* You want this record to show that to be your claim?

"*A.* That he must have let the slack back on me. He let it come back with such force.

"*Q.* That is right is it?

"*A.* Yes, sir. * * *

"*Q.* So that under your rules and regulations the engineer would not move until you signaled him to move?

"*A.* No.

"*Q.* That is right, is it?

"*A.* Yes, sir. * * * I was on the fireman's side of the train and the curve was on that side. I could see the way car and the engine. It was our purpose to get that train up the grade. The engine was headed up the grade. I had tried to raise the lever. That I couldn't do.

"*Q.* Now, in order to pull that pin with your hand, you had to have slack, didn't you?

"*A.* Yes, sir.

"*Q.* And, before you went in to pull that pin, you signaled for slack to the fireman?

"*A.* What, the first time?

"*Q.* No, the last time.

"*A.* No, sir.

"*Q.* When you went in to pull the pin?

"*A.* No, sir.

"*Q.* How did you expect to pull that pin without slack?

"*A.* I was going to wait until I got hold of the pin and got squared away before I give the signal for the slack.

"*Q.* You knew the engine was holding that train on the grade?

"*A.* Yes, sir.

"*Q.* How did you expect to pull that pin with your hand without slack?

"*A.* I didn't expect to pull it without slack.

"*Q.* Then you signaled for slack before you went in, didn't you?

"*A.* No, sir.

"*Q.* But if you did not expect to pull that pin without slacking, as you say, what did you go in there for?

"*A.* I went in to see if I could get hold of that pin, and, if so, I could raise it up, and then give the slack.

"*Q.* I thought you said you could not raise it without getting the slack?

"*A.* I could get hold of it, then reach out, and give a signal for slack.

"*Q.* What do you mean?

"*A.* I mean, to get in there and get hold of that pin and get all ready for the slack before I give the signal for it.

"*Q.* Do you mean to say you could reach down over those deadwoods and get hold of that pin, and from that position signal the engineer?

"*A.* That was what I was going to try to do.

"*Q.* You say you were going to try to do that?

"*A.* Yes, sir.

"*Q.* And you were going to hold on to that pin and hold it up with one hand while you signaled the fireman with the other?

"*A.* I was going to hold it up with one hand and signal back with the other.

"*Q.* And that was what you were trying to do?

"*A.* Yes, sir.

"*Q.* There is no mistake about that?

"*A.* No, sir.

"*Q.* Well, that would—it would be about as far as you could reach possibly, wouldn't it? From your hand on that pin to the outside of the car?

"*A.* Yes, sir.

"*Q.* But you were going to try it?

"*A.* I was going to see if I could make it.

"*Q.* You did not know certain whether you could make it or not, but you were going to try it?

"*A.* I was going to see if I could get there and get hold of that pin and give the fireman a signal to come back and give me the slack.

"*Q.* And, as you say, before you got your hand to the pin, the slack same back?

"*A.* Slack came back.

"*Q.* You were then reaching for the pin?

"*A.* I was just reaching over to get the pin.

"*Q.* And the slack came back?

"*A.* Yes, sir.

"*Q.* And you say you were trying to keep your arm above the deadwoods?

"*A.* Why, yes; reaching and just made an effort to get hold of the pin when the slack come back and caught my arm.

"*Q.* Your arm, of course, was not higher up than the deadwoods?

"*A.* It couldn't have been.

"*Q.* So you did not keep your arm above the deadwoods, but you reached in through the deadwoods?

"*A.* Why, that is the way it must have been. * * * The only danger it would be was for me reaching over there was for the engineer to let the slack back on me. Otherwise, it was perfectly safe. From the other side of the train as it stood on the curve I couldn't see the engine from the car. The curve there is quite a sharp curve there; extraordinary sharp curve. * * * Where I first tried to raise the lever, there was another lever on the opposite side of the car. The levers of the same car are not on the same side of the car. For example, if a car was headed north and on the north end there was a lever on the left side of that car, on the rear of that car there would be a lever at the right hand. That is the way they are made, and that is the way these cars are equipped. The train was headed north. I was on the left-hand side of the train.

"*Q.* So you were unable to advise the court as to whether or not there was anything defective with this lever, or either of those levers?

"*A.* Well, I can advise them that one lever that I tried to work wouldn't work, but I couldn't say what was the matter with it that it didn't work, and the other lever on the other side I didn't get across there because there was no chance to give a signal neither to the way car or the engine, so I would be practically no good at all there.

"*Q.* You saw nothing defective about it?

"*A.* No more than the lever didn't come way across on the side I was on."

Counsel for the defendant argue nine groups of errors. They have all been examined, but we think the following the important ones calling for discussion:

(1) Did the testimony for plaintiff so clearly establish negligence upon his part as to preclude a recovery?

(2) Should the court have directed a verdict because the cars which were foreign cars were inspected by an inspector who was a fellow-servant of plaintiff?

(3) It is claimed no negligence was shown on the part of defendant, and for that reason a verdict should have been directed.

(4) Should the case be reversed because of the improper argument made to the jury by counsel for plaintiff?

We will take up these questions in the order mentioned:

1. Was plaintiff guilty of contributory negligence as a matter of law? The statute, so far as relates to the couplings in use upon this occasion, required—

" Some form of safety coupler or safety coupling device by which the cars can be coupled and uncoupled from either side of the train without the necessity of going between the cars: * * * *Provided, further,* That no freight car shall be run upon any of the railroads within this State after the first of January, eighteen hundred and ninety-one, unless furnished with safety couplers as provided by this act." 2 Comp. Laws, § 5511.

In *Swick* v. *Cement Co.,* 147 Mich. 454 (111 N. W. 110), it was held that, as the doctrine of the assumption of risk by the employé rests upon the contract of employment, as the master cannot legally contract to violate a

statute, the servant does not assume a risk growing out of an omission to perform a statutory duty. In the same case there is an elaborate discussion of the difference between the doctrines of assumed risk and contributory negligence, and in the opinion it is said that the latter defense may be open when the former may not be made. We have quoted very fully from the testimony of plaintiff to show how the accident occurred, and what knowledge he had of the situation.

There is testimony in the case that many automatic couplers have a bar, to which the chain is attached that lifts the pin, which extends clear across the end of the car with a lever at each end. The cars upon this train were so equipped that, when plaintiff failed to lift the pin with the lever, which he says he repeatedly tried to do, he was compelled either to try to lift the pin the way he did try or else to go around the car and lift the lever. If he did this, he could not be seen by the engineer, and he would be in a position where he could not control the movements of the train. The statute does not contemplate that the equipment may be such that the brakemen can uncouple the car from one side or the other of the train without the need of going between the cars, but the provision is that the equipment shall be such that the car can be coupled or uncoupled from *either side* of the train without the *necessity of going* between the cars. The brakeman has the right to expect a device which will allow him to uncouple the car from either side of the train. It is clear from the testimony of the plaintiff that he tried and failed to separate the train without the necessity of going between the cars, and that the only way the car could be uncoupled from the side of the train upon which he stood was to do just what he attempted to do. It should not be forgotten that this train was not stalled in a yard, but it was stalled between stations and blocked the only track between stations, and no train could pass until the train continued its journey, and its continuing on was important. The whole situation was before the plaintiff. He

was in a difficult situation.   We think it cannot be said, in the light of the testimony and the situation, as a matter of law, that plaintiff was guilty of contributory negligence, but the testimony presents a question for the jury.   See *DeCair* v. *Railroad Co.*, 133 Mich. 578 (95 N. W. 726); *Gillespie* v. *Railway Co.*, 150 Mich. 304 (113 N. W. 1116); *Smith* v. *Railway*, 155 Mich. 466 (119 N. W. 640).

2. The record discloses that the foreign cars were inspected the morning of the day when the accident happened, and it is insisted the inspector is a fellow-servant of the plaintiff, and because of this inspection defendant is relieved of liability; counsel citing *Lellis* v. *Railroad Co.*, 124 Mich. 37 (82 N. W. 828, 70 L. R. A. 598), and some of the cases cited therein.   An examination of these cases will show that in none of them was the question of neglect of a statutory duty involved.

3. Was no negligence shown on the part of defendant? The statute requires the use of a coupling device "by which the cars can be coupled and uncoupled from either side of the train without the necessity of going between the cars;" and forbids the use of cars without such a device.   In *Toledo, etc., R. Co.* v. *Kountz*, 168 Fed. 832, 94 C. C. A. 244, Judge Knappen, speaking for the court, said:

"Request No. 16 asked an instruction that if the jury—

"'Should find that Miller, before he attempted to cross the tracks, knew that defendant's train was approaching at a rapid rate of speed, and with such knowledge attempted to cross the track ahead of said train, and that this was the proximate cause of his death, as said term has been defined to you above, then you are instructed that the plaintiff is not entitled to recover.'

"This requested instruction, it will be seen, proceeded upon the theory that, if Miller's act in crossing the tracks ahead of the train was the proximate cause of his death, there could be no recovery, even though such crossing was in the regular discharge of his duty, and although he

had no other way to go to his station except by crossing the tracks, and notwithstanding his conduct was entirely free from negligence. The jury was permitted under the charge of the court to find for the plaintiff only upon the theory that Miller's death was caused by the catching of his foot in the unblocked frog. The failure of defendant to comply with the statutory requirement of blocking the frog was negligence as matter of law. *Cincinnati, etc., R. Co.* v. *Van Horne,* 69 Fed. 139, 140, 16 C. C. A. 182; *Lake Erie, etc., R. Co.* v. *Craig,* 73 Fed. 642, 19 C. C. A. 631; *Narramore* v. *Railway Co.,* 96 Fed. 298, 300, 37 C. C. A. 499 (48 L. R. A. 68). The statute is designed for the protection, not only of employés who may step into them, but of those dragged or pushed into them by an engine. *Cooper* v. *Railroad Co.,* 159 Fed. 82, 86 C. C. A. 272 (16 L. R. A. [N. S.] 715)."

In the case of *St. Louis, etc., R. Co.* v. *Taylor,* 210 U. S. 281 (28 Sup. Ct. 616), involving the construction of a statute which provided (27 U. S. Stat. p. 531 [U. S. Comp. Stat. p. 3175]): "And after July first, eighteen hundred and ninety-five, no cars either loaded or unloaded shall be used in interstate traffic which do not comply with the standard above provided for," Justice Moody, speaking for the court, said:

"The evidence showed that drawbars, which, as originally constructed, are of standard height, are lowered by the natural effect of proper use; that, in addition to the correction of this tendency by general repair, devices called shims, which are metallic wedges of different thickness, are employed to raise the lowered drawbar to the legal standard; and that in the caboose of this train the railroad furnished a sufficient supply of these shims, which it was the duty of the conductor or brakeman to use as occasion demanded. On this state of the evidence the defendant was refused instructions, in substance, that if the defendant furnished cars which were constructed with drawbars of a standard height, and furnished shims to competent inspectors and trainmen and used reasonable care to keep the drawbars at a reasonable height, it had complied with its statutory duty, and, if the lowering of the drawbar resulted from the failure to use the shims, that was the negligence of a fellow-servant, for which the

defendant was not responsible. In deciding the questions thus raised upon which the courts have differed (*St. Louis, etc., R. Co.* v. *Delk*, 158 Fed. 931, 86 C. C. A. 95), we need not enter into the wilderness of cases upon the common-law duty of the employer to use reasonable care to furnish his employé reasonably safe tools, machinery, and appliances, or consider when and how far that duty may be performed by delegating it to suitable persons for whose default the employer is not responsible. In the case before us, the liability of the defendant does not grow out of the common-law duty of master to servant. The congress, not satisfied with the common-law duty and its resulting liability, has prescribed and defined the duty by statute. We have nothing to do but to ascertain and declare the meaning of a few simple words in which the duty is described. It is enacted that:

" 'No cars, either loaded or unloaded, shall be used in interstate traffic which do not comply with the standard.'

"There is no escape from the meaning of these words. Explanation cannot clarify them, and ought not to be employed to confuse them or lessen their significance. The obvious purpose of the legislature was to supplant the qualified duty of the common law with an absolute duty deemed by it more just. If the railroad does in point of fact use cars which do not comply with the standard, it violates the plain prohibitions of the law, and there arises from that violation the liability to make compensation to one who is injured by it. It is urged that this is a harsh construction. To this we reply that, if it be the true construction, its harshness is no concern of the courts. They have no responsibility for the justice or wisdom of legislation, and no duty except to enforce the law as it is written, unless it is clearly beyond the constitutional power of the law making body. It is said that the liability under the statute, as thus construed, imposes so great a hardship upon the railroads that it ought not to be supposed that congress intended it. Certainly the statute ought not to be given an absurd or utterly unreasonable interpretation leading to hardship and injustice, if any other interpretation is reasonably possible. But this argument is a dangerous one, and never should be heeded where the hardship would be occassional and exceptional. It would be better, it was once said by Lord Eldon, to look hardship in the face rather than break down the rules of

law. But, when applied to the case at bar, the argument of hardship is plausible only when the attention is directed to the material interest of the employer to the exclusion of the interests of the employé and of the public. Where an injury happens through the absence of a safe drawbar, there must be hardship. Such an injury must be an irreparable misfortune to some one. If it must be borne entirely by him who suffers it, that is a hardship to him. If its burden is transferred, as far as it is capable of transfer, to the employer, it is a hardship to him. It is quite conceivable that congress, contemplating the inevitable hardship of such injuries, and hoping to diminish the economic loss to the community resulting from them, should deem it wise to impose their burdens upon those who could measurably control their causes, intsead of upon those who are in the main helpless in that regard."

The business of brakeman at the best is an exceedingly hazardous one. The legislature has attempted to diminish its hazards by the enactment of this statute. The language used is plain and unequivocal, and should be given its ordinary meaning.

In *Layzell* v. *Coal Co.*, 156 Mich. 268 (117 N. W. 179, 120 N. W. 996), the opinion quotes at length, and with approval, from the opinion in *St. Louis, etc., R. Co.* v. *Taylor, supra.* See, also, *Philadelphia, etc., R. Co.* v. *Winkler,* 4 Pen. (Del.) 387 (56 Atl. 112). In the case at bar the testimony of the plaintiff is that he attempted to uncouple the cars without going between them and was unable to do so. We think the jury was authorized to draw the inference from his testimony that defendant had neglected to use a coupling device upon the cars that were required to be uncoupled by which they could be uncoupled from either side of the train without the necessity of going between the cars.

4. Should the case be reversed because of the argument of counsel for plaintiff? Some of the argument was improper, and ought not to have been made. As to some of it, the trial judge in the presence of the jury chided the counsel. Some of the argument was a reply to the im-

proper argument of counsel for the defendant. While some portions of the arguments made should be censured, we do not think the case should be reversed because of them. See *Beauerle* v. *Railroad Co.*, 152 Mich. 345 (116 N. W. 424).

Judgment should be affirmed.