DOLSTROM v. NEWPORT MINING CO.

1. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE—PERSONAL INJURIES.

An employé working on a trestle, with knowledge that a cable used to draw tram cars had previously come off the idler on which it ran, and that it would straighten out if it did come off, so as to strike a person on the right-hand side of the trestle and throw him off, was guilty of contributory negligence for walking on the dangerous side of the trestle after adjusting the cable on the idler from which it had slipped.

2. EVIDENCE—OPINIONS.

It was error to permit a witness to testify that the side of the trestle on which plaintiff was walking was as safe as the other side, when it was self-evident that the cable, if it came off, would be thrown to the inside of the curve, so as to strike a person on that side.

Error to Gogebic; Cooper, J.    Submitted February 28, 1911.    (Docket No. 96.)    Decided March 31, 1911.    Rehearing denied June 3, 1911.

Case by Charles Dolstrom against the Newport Mining

Company, for personal injuries.   Judgment for plaintiff.
Defendant brings error.   Reversed.

*Herb. M. Norris* ( *James G. Flanders,* of counsel),
for appellant.

*P. H. O'Brien* and *George O. Driscoll,* for appellee.

STONE, J.   This is an action on the case for damages
for a personal injury suffered while the plaintiff was in
defendant's employ at the Bonnie mine on September 24,
1908.

At the time of the injury, the plaintiff was working as a
lander on the tram track, and he held the position of bell-
man.   He was about 27 years of age, and had held that
position for about two months before the injury, before
which time he had worked on the surface as a swamper
two years.   The tram track was built out from the shaft-
house on considerable of a curve to the right from a straight
line, a distance of about 600 to 700 feet, and was about 35
feet above the surface.   At a point about 200 feet out
from the shafthouse on this tram track, there was a
branch tram track curving to the right, known as the
"Newport trestle," which extended out from the main
track or tramway a distance of upwards of 300 feet.
The business was carried on as follows: The tram cars
were operated by a machine called a "puffer engine,"
which was situated in what is called a "puffer house,"
built up in the shafthouse.   The tram cars stood, when
being filled, on the left-hand side of the shafthouse look-
ing out.   The skips loaded with ore were hoisted up the
shaft by means of the hoisting engine located in the engine
house some 300 feet distant from the shafthouse, and when
the loaded skip reached a certain point in the shafthouse
above the tram car, the ore was automatically dumped
into a chute which conveyed it to the tram car.   Then up-
on a signal from the bellman, the plaintiff, by a bell pro-
vided for that purpose by defendant, located in the puffer
house, and operated by means of a wire running out to the

shafthouse, to a point where the bellman stood, the puffer engine was started, unwinding the coil of cable attached to the tram car from its drum, and the weight of the loaded car would carry it out on the tram track in which there was a slight decline outwards to the point where another man, also called a "lander," who rode upon the car, would dump it. After the car was dumped, the lander riding on the car would give the bellman, the plaintiff, a signal by hand that the car was in readiness to be drawn back into the shafthouse. It was then the duty of the bellman to give the signal, by bells, to the man operating the puffer, who would reverse the action of the drum attached to the puffer, and draw the car back into the shafthouse, over the tramway, to be filled again. The evidence is undisputed that the puffer man had no right to start the puffer in motion for any purpose, except upon the receipt of signals from the bellman so to do. The puffer man, Erickson, a witness for plaintiff, testified:

"It was my duty to run that car the way Dolstrom (plaintiff) signaled me. I had no right to operate the puffer, nor to move the car unless I got signals from Charlie (plaintiff) to do so. I had no authority or power over Charlie in any way in the performance of his duties. I couldn't do anything until Charlie told me to."

On the day of the injury to the plaintiff, all of the ore handled from those tramways was being run out on the Newport trestle. Just before the injury, the loaded tram car had been let out to the end of the Newport trestle on a signal from the plaintiff, the ore contained in the car dumped, and on a signal from the plaintiff to the puffer man the car was drawn in to a point near the junction between the main trestle and the Newport trestle, at which time the cable which was attached to the puffer and the car came off the idler, which was located at a point about 75 feet from the shafthouse; it came off and went to the right-hand side of the idler, looking out from the shafthouse, and, in order to pull or slip off from the idler at all, it must necessarily fall to the right-hand side of the

idler, looking out. This idler, with other idlers, was located in the center of the track between the rails for the coil or cable to run on while being let out and drawn in, so as to keep it in proper alignment with the car. The track of the tramway being on a curve to the right, and describing an arc, when the cable was pulled off from the idler in the operation of the engine and car, the necessary tendency of the cable was to straighten, which would naturally throw it to the right of the idler, looking out from the engine house.

The first time the coil or cable came off from the idler to the right-hand side the puffer man stopped the puffer engine, which stopped the car. Whether this was done on a signal from the plaintiff, or whether it was done because the puffer man had observed that the cable was off, is not clear from the evidence. The plaintiff went out upon the tramway, saw the cable lying to the right of the idler, and replaced the cable in its proper position over the idler, as it was his duty to do, under his employment, according to the claim of the plaintiff. After so replacing the cable, the plaintiff gave the signal by waving with his hand to pull in the car, walked back upon the right side of the track, facing the shafthouse, and into the shafthouse to his post of duty there. The car was drawn into the shafthouse in its proper position under the chute for reloading with ore. The tram car was reloaded, and the plaintiff again gave a signal to the puffer man by the ringing of the bell to operate the puffer, letting the car out upon the tramway for the dumping of the ore. This signal was complied with. The car was run out again upon the Newport trestle, there dumped, and the puffer man was given the bell signal by the plaintiff to draw the car in, upon which the puffer was started and the car drawn to a point near the junction of the main tramway and the Newport trestle, when the cable again came off the idler, as before, and went to the right-hand side of the idler, looking out from the shafthouse, whereupon the plaintiff again went out upon the tramway to replace the

cable over the idler, finding it lying at the same place as before.   He replaced it over the idler, although the exact manner in which he handled it is not clear from the testimony.   Whether any signal was given is not clear.   The plaintiff testified that he did not remember whether he gave a signal or not.   The puffer man testifies to a hand signal the second time, but he says that plaintiff was injured on the third occasion, instead of the second.   Whether on a signal or not, the puffer man started the car, and, when he next saw the plaintiff, he had stepped over to the left-hand side of the cable as he faced the shafthouse, instead of walking back upon the other side as he did before.   At this time the cable again came off the idler, and, as it straightened out, it struck the plaintiff's right leg near the ankle, and knocked him off the trestle to the ground 35 feet below, and he received the injury of which he complains in his declaration.   Under the undisputed evidence, the width of the trestle outside of the track where the plaintiff stood when he was hit was about two feet, while on the opposite side where he walked before, the width was three times as great; the width of the track between the rails being two feet.   It was the claim of the plaintiff (under the first count of his declaration, which was the count under which the case was submitted to the jury) that the puffer engine was out of order and was defective, and that it worked erratically on the day in question, and had been so working and out of order for some time, of which the plaintiff was ignorant, and that it was because of this condition that the cable was jerked off from the idler against which it ran in hauling the car, and that this was the proximate cause of the injury to the plaintiff, and that he had never been instructed of the danger.

The case was submitted to the jury, and the plaintiff recovered a verdict and judgment.   The defendant has appealed, and there are 32 assignments of error.   The tenth assignment of error is upon the ground of the refusal of

the court to give the defendant's requests to charge. Defendant's first five requests to charge were as follows:

" (1) I charge you that under the evidence in this case, and the law applicable to it, the plaintiff cannot recover because he has not shown that he exercised due care and caution in the performance of his duties, and the performance of his work on the trestle, or tramway of the defendant's company, on the day that he was injured. The burden of proof on this particular question is on the plaintiff, and he must prove the same by direct testimony. You cannot infer as against the defendant, in this case, that the plaintiff exercised due care and caution in the performance of his duties, so as not to receive the injury sued for, in this case. The undisputed testimony shows that the plaintiff in this case had absolute and entire charge and control of the puffer man, as to the operating of the machinery, and the car attached to the coil of rope, or wire, which knocked the plaintiff off the track and injured him. He has testified, himself, and has proven by other witnesses that the man operating the puffer had no right to move the car or rope or start the puffer, except on signals from him. He tells you that he does not know whether he gave a signal to start the car at the time he was injured or not.

" (2) I further charge you that the danger that the plaintiff was in, in the performance of his duties, was not only entirely under his control, so that he could make the performance of such duty absolutely safe, in so far as the accident in this case was concerned, but that the danger was also an obvious and apparent danger.

" (3) And I also charge you that this was known to the plaintiff because of the fact that the coil had been off the roller twice before he was injured, and on each time it had been off on the right-hand side of the track, going out from the shafthouse. And he knew, or ought to have known, from these conditions that the coil was liable to come off the roller again, and that if it did come off, that it must come off on the side of the track that he was walking on at the time he was struck, and that he was not therefore using due care and caution in walking back to the shafthouse on his left-hand side of the coil, when by exercising reasonable care and caution, and with the danger so obvious and apparent, he knew, or ought to have known, if he walked back to the shafthouse on his

right-hand side of the coil that he could not be possibly struck with the coil, even if it did come off the roller.

"(4) And I charge you in this connection that whether or not it was the shortest way for him to get back to the shafthouse by going on his left-hand side of the track and coil or not, is absolutely immaterial in this case. That he cannot be absolved from his carelessness in performing his work simply because he thinks he can do it quicker or easier when at the same time he knew, or must have known, that that was a dangerous way, and that by going a little farther in another manner he could avoid the injury which he received.

"(5) I also charge you that if no signal was given by the plaintiff to the puffer man who operated the car and the puffer, either to start it or stop it, that then under the undisputed testimony the accident was caused by the carelessness of the puffer man in not knowing or waiting for signals from the plaintiff, before he operated the puffer and car, because under the undisputed evidence the puffer man is a co-employé of the plaintiff, and the carelessness of the co-employé estops the plaintiff from recovery."

By these requests to charge the question of the contributory negligence of the plaintiff is raised. The undisputed testimony shows that the defendant had inaugurated a bell system to be operated by plaintiff in warning the puffer man as to the time when to stop, and when to start the puffer engine, and placed the puffer man exclusively under the control of the plaintiff. These facts were fully known to the plaintiff. This was sufficient to justify the defendant in the claim that the plaintiff was guilty of contributory negligence in directing the starting of the puffer, when he was in a dangerous place on the track, if he did order it started; and, if he did not signal Erickson to start the puffer, and Erickson started it against the rules of the defendant, then it was the negligence and carelessness of a fellow-servant. But, in addition to this, there were other conditions known to the plaintiff. A few minutes before the injury the cable had come off the idler at least once, if not twice. It had fallen to the right-hand side of the idler looking out from the shafthouse. He had seen it there. He had readjusted it before, and had walked

back to the shafthouse on his right-hand side of the track looking toward the shafthouse, where the track was wide and where it was perfectly safe, and where it was impossible to be hit by the cable if it came off the idler. Yet with all that knowledge, when the cable came off the last time, and as he says he found it lying in the same place as before, he readjusts it, and then steps into the only place of danger, to wit, upon the left-hand side of the track. looking toward the shafthouse, and received the injury complained of. In so doing he was guilty of contributory negligence.

As was said by this court in *Buckley* v. *Railroad Co.*, 119 Mich., at page 586 (78 N. W. 656):

" If this did not constitute negligence, it would be difficult to find a case of negligence. "

*Levy* v. *Railway Co.*, 164 Mich. 572 (129 N. W. 683). It is unnecessary to enlarge upon this branch of the case, as it falls within the rule of contributory negligence so often stated by this court. *Glover* v. *Scotten*, 82 Mich. 369 (46 N. W. 936); *Powers* v. *Lumber Co.*, 92 Mich. 533 (52 N. W. 937); *Benage* v. *Railway Co.*, 102 Mich. 72 (60 N. W. 286); *Wight* v. *Railroad Co.*, 161 Mich. 216 (126 N. W. 414). Counsel for the plaintiff cite: *Shadford* v. *Railway Co.*, 121 Mich. 224 (80 N. W. 30); *Hewitt* v. *Lumber Co.*, 136 Mich. 110 (98 N. W. 992); *Butterfield* v. *Arnold*, 131 Mich. 583 (92 N. W. 97); *Barschow* v. *Railway Co.*, 147 Mich. 226 (110 N. W. 1057), and *Sabin* v. *Leather Co.*, 157 Mich. 579 (122 N. W. 300), and kindred cases. In our opinion these cases are not in point here. In the instant case the plaintiff had witnessed the movement and operation of the cable when it came off the idler only a few minutes before, and it is incredible that he did not know that, if it came off again under the same conditions, it would go to the same side and place. In the very nature of things it could go nowhere else, and he must

have known it.   He knew that it was liable to come off again, and he saw fit to take his chances.

It was error to permit witnesses to testify that in their opinion the other side was as dangerous as where plaintiff was injured.   They could only properly testify to facts from which the jury might determine whether the place where the plaintiff was, was safe.   Those witnesses were not experts, nor was the subject one requiring special skill or the aid of science.   *Kelley* v. *Town of Fond du Lac*, 31 Wis. 179.   The testimony that the opposite side was as dangerous as the side taken by the plaintiff was opposed to the laws of nature, and a jury ought not to be asked to give any weight to testimony which is contrary to what every person of ordinary intelligence knows to be true. That the cable would, when pulled off the idler by the operation of the puffer engine, be thrown to the place where plaintiff was injured, was a self-evident proposition, and the jury should not have been permitted to speculate upon the subject or find to the contrary.   *Washburn* v. *Railroad Co.*, 59 Wis. 364 (18 N. W. 328).   We are of the opinion that upon this record a verdict should have been directed for the defendant upon the ground of the contributory negligence of plaintiff.   This renders it unnecessary to discuss the question of the negligence of the defendant.

Some other questions are presented and discussed, but as they are not likely to arise upon another trial, in the light of our holding, we do not discuss them.

For the error pointed out, the judgment of the circuit court is reversed, and a new trial ordered.

OSTRANDER, C. J., and MCALVAY, BROOKE, and BLAIR, JJ., concurred.