CLARK v. GOLDIE.[1]

1. MASTER AND SERVANT—INJURIES TO SERVANT—DEFECTIVE AP-
PLIANCES—NEGLIGENCE OF MASTER—EVIDENCE—SUFFICIENCY.
In an action for the death of a servant, caused by the bursting
of an idle pulley, evidence examined, and *held*, insufficient
to show that defendant had knowledge of the defective con-
dition of the pulley.

2. SAME—DUTY TO INSPECT—DELEGATION.
The duty of inspecting machinery for the purpose of determin-
ing its safety is imposed by law upon the master, and no dele-
gation of that duty will lessen his responsibility; but the
duty to inspect for the purpose of keeping the machinery in
good working order is a duty which may be delegated, and
the master thereby absolved of responsibility.

3. SAME—FREQUENCY OF INSPECTION.
In an action against a master for the death of a servant caused
by the bursting of an idle pulley, evidence examined, and
*held*, insufficient to show that the master was negligent in
failing to inspect the pulley oftener than once in three
months.

Error to Bay; Shepard, J. Submitted June 7, 1906.
(Docket No. 39.) Decided November 7, 1906.

Case by Charles Clark, administrator of the estate of
William F. Clark, deceased, against William Goldie and
William Goldie, Jr., copartners as the Goldie Manufac-
turing Company, for the negligent killing of plaintiff's in-
testate. There was judgment for plaintiff, and defend-
ants bring error. Reversed.

*Cooley & Hewitt*, for appellants.

*De Vere Hall*, for appellee.

CARPENTER, C. J. This suit is brought to recover

compensation for the death of William F. Clark, deceased, plaintiff's intestate,· who was killed by the bursting of an idle pulley while he was in defendants' employ. Defendants are extensively engaged in the manufacture of pins used to plug holes left in railroad ties where spikes have been drawn. Clark operated a heading saw on the first floor of defendants' pin mill. This heading saw was driven by a belt from a countershaft; the countershaft running at right angles to the main shaft. The main shaft was connected to the countershaft by a belt which passed over two corner pulleys in order to make the turn. Between the lower corner pulley and the countershaft the belt was kept in position by an idle pulley (the bursting of this pulley caused Clark's death) placed underneath the belt to prevent its natural sagging from throwing it off, and to guide it onto the corner pulley. It was made of cast iron and was 12 inches in diameter, with an 8-inch face, and had four curved spokes about $\frac{3}{4}$ by $1\frac{1}{4}$ inches in size. The hub had about an inch and a quarter of metal each side of the bore. It revolved at the rate of from 1,400 to 1,500 revolutions per minute. It was above, and somewhat to one side of, where Clark stood to operate the saw.

The testimony shows that this pulley was selected and placed in position less than three months before it burst by one Drake, who was a witness on the trial for plaintiff. At that time the pulley was thoroughly inspected and found to be in good condition. Later, and some time in January, it was removed from the shaft upon which Drake put it and placed upon another. It remained in this position until March 6, 1903, when it burst; one of its pieces striking Clark on the head and killing him. The testimony of both plaintiff and defendants proves that the bursting of such a pulley under these circumstances is a very rare occurrence. Witnesses of many years' experience testified that they never knew of such an event. Defendants had an inspector, but it does not appear that he ever inspected this pulley or that he was charged with

the duty of inspecting it. The issue was submitted to a jury, who rendered a verdict in plaintiff's favor.

The principal ground upon which we are asked to reverse the judgment entered upon said verdict is that the evidence' did not warrant the submission of the case to the jury. It is contended that there is no evidence tending to prove defendants' negligence. There is nothing in the record which tends to prove that defendants had actual knowledge that the pulley was defective, unless there is, as plaintiff contends, evidence that it was broken at the time it was transferred from one shaft to the other in January. It therefore becomes material to determine whether there is any evidence that it was broken at that time. The only testimony relied on to prove this fact is that of witness Drake, sworn for the plaintiff. He testifies that, when he examined the pulley after the death of Clark ( the pulley had then been taken from the shaft ), he found hammer marks upon the hub, and he inferred from this that the pulley had been weakened by being hit with a sledge, and that this weakening occasioned its subsequent bursting. He subsequently testified that it would be proper to remove this hub, after the pulley had exploded, by a sledge, and, if it had been so removed, it would leave the marks he saw. Could the jury infer from this testimony that the hammer marks found on the hub were made by hitting it with a sledge when the pulley was changed from one shaft to the other ? Certainly not. This would be to permit them to "guess which one of several possible causes produced a certain result. This we have held they cannot do." *Fuller* v. *Railroad Co.*, 141 Mich. 66, and cases there cited. It follows that there was no evidence that defendants had actual knowledge of this defect. Plaintiff's case must rest, then, upon the theory that defendants were negligent in not discovering that the pulley was defective. Can it rest upon that theory ?

To answer this we must determine whether there is any evidence upon which this theory can be based. In determining this question, it should be borne in mind that

146 MICH.—20.

defendants' obligation to inspect is one not of insurance, but of diligence. They were not bound to inspect more often or more minutely than would an ordinarily prudent person. It should also be remembered in determining this question that the pulley was inspected and found to be in safe condition less than three months before it burst. Is there evidence to warrant the inference that an ordinarily prudent person would have made such an inspection of this pulley in these three months as would have discovered its defective condition? If the pulley had been exposed to any great strain, or if for any other reason it was likely to become unsafe, this question might be answered in the affirmative. But it was not, and, as already shown, the testimony of all the witnesses is that its bursting was not to be apprehended. Apparently nothing in the experience of mechanics indicated the duty of frequent inspection. It cannot be inferred that a person of ordinary prudence would have inspected such a pulley oftener than once in three months (this does not mean that he would have inspected it as often as that), unless there is testimony tending to prove that more frequent inspections are customarily made by ordinarily prudent employers in order that their machinery may be safe for their employés. See *Nichols* v. *Railroad Co.*, 145 Mich. 643; *Hanrahan* v. *Steamship Co.*, 22 L. R. Ir. 55. Is there such testimony? There is none, unless, as plaintiff contends, it is to be found in the following testimony of witness Drake:

"In my own experience it has been customary to inspect at all times. I have always wanted a close inspection of machinery at all times by the men in charge. This inspection is made by general observation every day in the mill work. * * * In mills I worked in the machinery was constantly being inspected by the man that was in charge. The man that is to use the machinery, or millwright, as a general thing. * * * He may look at it every day or every week.

"*Q*. What necessity is there ordinarily for inspecting such a pulley as that?

"*A.* There is always a necessity to know whether the machinery is correct or not.    *    *    *

"*Q.* If, in your experience of 28 years, you have never known of one to break under the same circumstances, what necessity is there for inspecting it every day?

"*A.* To know whether it is correct or not; to know whether it is right.    I didn't say it was necessary to inspect it every day, but at all times; every time you go near it; every time you oiled it.    It is necessary to know that it is in correct condition."

It is quite obvious that the inspection described in the foregoing testimony is not one which the employer adopts to discharge his duty toward his employés of keeping the machinery in a safe condition, but is an inspection adopted for the purpose of keeping the machinery in *good working order*.    These two inspections may be and sometimes are performed by the same person.    They may be and sometimes are performed by different persons.    Whether performed by one person or by different persons, there is a radical legal difference between them.    The duty of inspecting machinery for the purpose of determining its safety is imposed by law upon the employer, and no delegation of that duty will lessen his responsibility.    On the other hand, the duty to inspect for the purpose of keeping the machinery in good working order is a duty which may be delegated, and the employer thereby absolved of responsibility.    In certain cases the distinction between these two inspections may be of no practical consequence.    It is sufficient to say that that distinction exists and is of consequence in this case.    The existence of that distinction, as well as its importance, is shown by that large class of cases where an employer delegates to employés in charge of complicated machinery the duty of keeping that machinery in good working order while reserving to himself, or delegating to a superior subordinate, the duty of inspecting that machinery for the purpose of keeping it in safe condition.    To refuse to recognize the distinction in these cases would be to assert that the class of employés first described are vice principals.    It is well settled that

they are fellow-servants. It is therefore clear that the custom referred to in the foregoing testimony of witness Drake of frequently inspecting machinery for the purpose of ascertaining that it is in correct working order has no bearing whatever upon the duty owed by defendants to plaintiff's intestate of inspecting machinery for the purpose of determining whether or not it was in a safe condition.

We are therefore bound to say that there is no testimony tending to prove a custom to frequently inspect such machinery as that in question in this case. It follows that the trial court erred in declining to direct a verdict in defendants' favor.

Judgment reversed, and a new trial ordered.

McALVAY, GRANT, HOOKER, and MOORE, JJ., concurred.