MEOLA *v.* QUINCY MINING CO.

1. MASTER AND SERVANT—NEGLIGENCE—NOTICE—EVIDENCE.

Testimony tending to show that a trolley wire in a mine became loosened from its clamp so as to sag, 24 hours before plaintiff's intestate was killed, that the defective condition was reported to the trammer boss, who gave directions to remedy the defect by tying it up with a piece of fuse, that it became loosened again and fell upon decedent, presented a question of fact on the question of negligence.

2. SAME—CONTRIBUTORY NEGLIGENCE.

Whether or not plaintiff's intestate knew of the defective condition of the wire, in the absence of positive testimony as to the fact, *held,* to present a question for the jury relative to his negligence and assumption of the risk.[1]

3. SAME.

Under rules of defendant corporation requiring its miners to cease employing the electric current and to push cars by hand past the point of defect, if the wire became out of repair, the court should have instructed the jury that if plaintiff knew, or, in the exercise of ordinary care, should have known, of the defective condition, he was chargeable with assumption of the risk in using the power instead of pushing the car by hand.

4. SAME—CHARGE—SAFE PLACE.

The trial court erred in charging the jury that it was defendant's duty to use the greatest possible care in maintaining the tram-car, clamp, or connection of the trolley wire to the bracket in reasonably safe condition: defendant's duty to inspect and repair appliances was the duty to use ordinary care, having in consideration the hazardous nature of the instrumentality.

5. DAMAGES—VERDICT—DEATH—EARNING CAPACITY.

A verdict of $5,040 for the death of a miner, who only contributed $25 to $30 every second month to his family, his estimated contributions on that basis amounting to $1,276.22 during his expectancy, was excessive and unwarranted.

[1] Assumption of risk by servant of danger of electric shock, see note in 32 L. R. A. 353.

Error to Houghton; Streeter, J. Submitted January
23, 1913. (Docket No. 74.) Decided March 20, 1913.

Case by Leonard Meola, administrator of the estate of
Antonio Tabaracci, deceased, against the Quincy Mining
Company for the unlawful killing of plaintiff's intestate.
Judgment for plaintiff. Defendant brings error. Re-
versed.

*Hanchette & Lawton*, for appellant.

*Burritt & Burritt*, for appellee.

Plaintiff is administrator of the estate of one Antonio
Tabaracci, who on December 8, 1908, was instantly killed
in defendant's mine. Decedent lost his life through com-
ing in contact with a loosened trolley wire carrying a
lethal current.

Decedent had been in the employ of defendant for some
years as a trammer. It is the duty of the trammer to
load the broken rock upon tram cars and deliver it at the
shaft. Originally these tram cars were pushed by hand.
Of late years electricity has been introduced as a motive
power; the same or similar cars being used. A small
motor, about 7 feet long, called a "pony," operated by a
boy called a "pony boy," is attached to the tram cars,
and they are thus moved about through the drifts upon
tracks built for that purpose. The power is carried
throughout the mine upon a copper wire. In the drifts
this trolley wire is attached to the top or hanging wall by
means of an insulated swivel, to which is attached a clamp,
which fits into a groove on each side of the wire. Three
screws are then tightened upon the clamp, and the wire is
held in place. The power is transmitted from the trolley
wire to the "pony" by means of a pole, about 7 feet long,
which may be set in a socket upon either of the four cor-
ners of the "pony."

At the sixty-second level in defendant's mine, the trolley
wire had, on the day of the accident, been extended north

of shaft No. 7 about 100 feet and south of the shaft some-
thing over 400 feet.   On the night of the accident deced-
ent and his partner, one De Santi, worked for a time tak-
ing rock from the drift north of the shaft.   As the trolley
wire ran only 100 feet in that direction, they had to propel
cars by hand the balance of the distance.   After the mid-
night meal they made one trip north, and on the second trip
went south of the shaft, where the wire ran for a distance
of over 400 feet and within a few feet of the point where
the cars were to be loaded.   On this trip Isabell, the pony
boy, was seated upon the rear seat of the "pony," while
decedent and his partner were likewise riding upon the
motor or "pony."   The car moved about as fast as a man
walks.

When they approached the place in the drift where the
cars were to be loaded, it was discovered that the trolley
wire had become loosened from one of the clamps, and
was sagging down.   The "pony" was stopped, and Isabell
got off and with a piece of board turned the clamp cross-
wise, and then, pushing the wire up with the board,
placed it on top of the end of the clamp.   They then pro-
ceeded safely under the clamp to the loading place, and,
after loading, hauled the cars out to the shaft and unload-
ed them.   A second trip was made to the point where
they were returning to the shaft with the loaded cars.
When the "pony" reached the defective clamp upon this
trip, the trolley wheel, after passing under the clamp, miss-
ed the wire on the other side, thus depriving the "pony"
of power.   Either Tabaracci, the decedent, or De Santi,
probably De Santi, made several attempts to replace the
trolley upon the wire.   In making this effort the wire was
pushed off, or fell off, of the clamp and, sagging down,
came into contact with Tabaracci's arm.   The current
passing through his body caused instant death.   The
voltage carried upon the wire was automatically limited
to from 250 to 275 volts.   Ordinarily it is considered that
a voltage of at least 500 is necessary to cause death.

The record establishes the fact that when the wire is

found out of order it is the duty of the pony boy to "pull the jumper"—turn off the current—and notify the shift boss or trammer boss, who, if the defect is a simple or trivial one, such as this one was, will at once remedy it. If the defect be more serious, the wiremen are notified, who in due time make the necessary repairs. In the meantime, while the wire is out of order, it is the duty of the trammers to push the cars by hand. Plaintiff introduced testimony tending to show that on the night shift previous to the night in question (a day shift intervening) the wire at the same point had become detached from the clamp, and had been tied up with a piece of fuse by a miner named Tiva. This witness testified that he reported the defect to the trammer boss, and himself tied it up as the trammer boss directed. The defective condition of the clamp and wire on the night of the accident was not reported to the shift boss or the trammer boss, but was fixed by Isabell upon his own initiative.

Tabaracci left a widow and three children, between the ages of 12 and 16 years, all of whom resided in a foreign country. An older married daughter resides in Michigan.

Plaintiff offered testimony tending to show that decedent had sent to his mother from $25 to $30 every second month; and that, based upon his expectancy, and assuming the contributions would continue, the sum decedent would have contributed to his family would be $1,276.22. Defendant offered to show the actual wages received by Tabaracci during a certain period preceding his death. This evidence was excluded as being equally within the knowledge of the deceased. A verdict was rendered for $5,040. A motion for a new trial was denied.

BROOKE, J. (*after stating the facts*). Under the testimony of the witness Tiva, to the effect that the trolley wire had become loosened from the clamp 24 hours previous to the accident, that the defect was reported to the trammer boss, and that it was fixed by Tiva at the direction of the trammer boss, we are of opinion that the ques-

tion of defendant's negligence was for the determination of the jury.

Upon the question of decedent's negligence, the following facts are undisputed: When the trolley wire becomes defective, it is the duty of the trammers to push the cars by hand past the defective place until the defect is repaired. Witnesses for the plaintiff agree with witnesses for defendant upon this point. The place where the wire came loose from the clamp was within a very few feet (possibly 20) of the place where the loading was done. When this crew went into the south drift on its first trip, the defective condition of the wire was discovered and remedied in the manner indicated in the statement of facts, *supra.* Upon the fatal trip, instead of pushing the cars by hand a few feet past the defective place, the crew rode upon the "pony," and attempted to move the cars past that point by means of the electric power. The drift was lighted by "sunshine" lamps carried by each man on his hat. The drift was from 15 to 30 feet wide and at this point about 8 or 9 feet high. The "pony" (motor) upon which the crew rode upon its first trip was about 3 feet high, 4 feet wide, and 6 or 7 feet long. Decedent was 39 years of age and an experienced trammer, having worked several years in defendant's mine.

The foregoing facts being unquestioned, it becomes important to inquire what knowledge decedent had, or, in the exercise of ordinary prudence, should have had, of the defective condition of the wire at the point where he lost his life. Three persons only knew what occurred at the time the defect was discovered upon the first trip in. They are Isabell, the pony boy, De Santi, the trammer, and Tabaracci, the decedent.

Isabell, sworn for the plaintiff, testified, in part, as follows:

"*Q.* When you came out there on your first trip, you saw this trolley wire sagging?

"*A.* Yes.

"*Q.* Now, was it low enough so that, if you were under it with your motor, it would touch your head?

"*A.* Yes.

"*Q.* What did you do? Did you run by it?

"*A.* We stopped, and I turned that piece of steel, and with a piece of powder box put the wire on the steel.

"*Q.* Who did that?

"*A.* I did.

"*Q.* Well, in coming out, how were your cars arranged; which part was your motor in?

"*A.* I think that one car was in behind and one car on front and the motor between.

"*Q.* Which end of the motor car were you sitting at your position? Was the motor car in front of you or behind?

"*A.* Going in the drift the motor was in front of me, and going to the shaft the motor was in the rear.

"*Q.* The trolley pole is about how long?

"*A.* About six or seven feet.

"*Q.* Was that swinging back?

"*A.* It was.

"*Q.* When you saw this wire sagging down, did you stop the motor car?

"*A.* Yes.

"*Q.* About how fast do you run those motor cars in comparison to about how fast a man would walk?

"*A.* Not much faster than a man could walk.

"*Q.* So you got off and walked around the motor car and picked up a piece of powder box?

"*A.* Yes.

"*Q.* How long a piece?

"*A.* About a foot and a half or two feet.

"*Q.* And you pushed the cable up and hooked it over on this piece of steel, you say, which piece is the piece that held the cable with these screws?

"*A.* Yes.

"*Q.* And you had to turn those pieces of steel crosswise?

"*A.* Yes; I did.

"*Q.* When you put the wire on top, did that piece of steel hold stiff enough to hold the wire?

"*A.* Yes.

"*Q.* Did Tabaracci see you do that?

"*A.* I wouldn't say that he seen; but they were both on the car and most naturally would have seen me.

"*Q.* Was he looking at you ?

"*A.* He knew that I stopped the car, and he must have taken notice.

"*Q.* Do you know if they all saw it ?

"*A.* No; I don't know whether they all saw me.

"*Q.* Do you know if they all saw the wire sagging down from this bracket ?

"*A.* I don't know positively, only as I have said.

"*Q.* Tabaracci knew that the car stopped ?

"*A.* Yes.

"*Q.* How far were you from the place where you were to fill the cars ?

"*A.* About 20 feet.

"*Q.* Now, this steel, you understand, is what I mean by the clamp that held the wire.

"*A.* There is no spring in it; it is sort of half-moon like, and is hollow.

"*Q.* When you say the 'steel,' you mean the one about 6 inches long that held the wire inside of it ?

"*A.* Yes.

"*Q.* I will call it the ' clamp.' When you went around with this piece of powder box and hooked the wire over this clamp, did Tabaracci get off and walk over to the chute ?

"*A.* I don't know.

"*Q.* You came back and got on the motor car ?

"*A.* Yes.  *  *  *

"*Q.* Did you, at the time you put this trolley wire upon these pieces of steel or clamp, or on this bracket, did you tie it with a piece of fuse ?

"*A.* No.

"*Q.* Why not ?

"*A.* I didn't think it necessary.

"*Q.* You could have tied it, could you, with a fuse, if you thought it was necessary ?

"*A.* I had never tied any with fuse, so I didn't naturally think it necessary.

"*Q.* You thought that it would stay up there till you got through with that shift ?

"*A.* I wasn't sure that the wire would stay up there, but took chances.  *  *  *

"*Q.* State if Tabaracci saw the wire sagging from this bracket at the time that you got off to put the wire on.

"*A.* I wouldn't swear to it; I am not positive; they most naturally would have seen it.

"*Q.* Didn't you state a minute ago that Tabaracci saw the wire sagging ?

"*A.* He most naturally would have seen it, because he was sitting in front of me. I don't know if he called my attention to it or not.

"*Q.* By calling your attention to it, you mean told you that the wire was loose, and told you to stop the car ?

"*A.* Yes.

"*Q.* You are, therefore, unable to say who saw the wire sagging first ?

"*A.* No.

"*Q.* But you say that Tabaracci might have called your attention to it ?

"*A.* I don't remember.

"*Q.* Did you have to hunt around the level to find the stick ?

"*A.* I don't remember.

"*Q.* Was Tabaracci facing you and could see what you were doing ?

"*A.* I don't know if he was sitting sideways or backways.

"*Q.* Was there light enough so that he could see all your movements ?

"*A.* Yes.

"*Q.* He sat there on the motor all the time while you were fixing—

"*A.* I think he did. I don't remember having some conversation with him about it at that time; I am not positive that they looked on and watched what I did; I am not positive; I don't remember. I remember what I did; I went to put up the wire, and they were on the motor; they knew where I was going; I won't swear if they seen me put it up.

"*Q.* How about seeing the wire sagging before you stopped the motor ?

"*A.* What do mean ? They most naturally could see it. They were in front of me.

"*Q.* And by that they had a good chance for observation ?

"*A.* Yes.

"*Q.* (By Mr. Burritt): How is that drift lighted ?

"*A.* By our lamps; I am not positive whether or not Anton Tabaracci observed the defective condition of that wire and bracket; I am not positive whether he did know; I do not know of my own knowledge whether Tabaracci

observed that the condition of the wire and bracket was defective.

"*Q.* (By Mr. Lawton): When you stopped the car, the wire was sagging down close to their heads?

"*A.* If I had stopped the car under the wire, it would have hit them, if they did not watch out for it.

"*Q.* At the point that you did stop the car, the wire was sagging over their heads?

"*A.* A few feet away."

De Santi testified as follows upon this point:

"That wire was loose before when we used it, a little while before on that shift; it was loose, but there was a fuse keeping it up; it was loose and sagging down. I don't remember when Isabell stopped the car and put the wire back up over on the bracket; he may have done it, but I don't remember. I don't remember, either, that he stopped the car when he was coming into the drift; he may have tied it up while we was inside loading the cars; he may have tied it up; I don't know; sometimes he may do it while we was inside at the chute loading the car. I don't believe I seen the wire, because we didn't stay there all the time to look up and see if it is loose; I don't remember if I seen it."

Based upon the foregoing testimony, the conclusion that Tabaracci saw Isabell fix the wire on the first trip in, and therefore knew, or, in the exercise of ordinary prudence, should have known, of the defective condition of the wire which later caused his death, is almost irresistible. Yet we do not think it should be said, as a matter of law, that he had such knowledge. If he did know of the defective condition, and continued to use the electric power for tramming, instead of pushing the cars by hand past the defective point until it was repaired, as he was required by the rules to do, he should unquestionably be held to have assumed the risk of injury from such use.

Defendant's seventh request is as follows:

"(7) Under the undisputed testimony in the case, it is against the rules to tram by the motor car or machine when the wire is out of order; but the rule is to have it fixed at once before using the motor car further. In the

meantime, if necessary to tram, push the cars by hand. This is a rule and a custom of the mine which is established for the safety of the men, and the rule that they should follow. Had this rule been followed in this case, no injury would have happened; and the testimony undisputedly shows that the injuries resulted from violating this rule. The company, therefore, is not responsible for the accident, and the plaintiff's intestate cannot recover."

This request was refused, and no reference was made in the charge as to the duty imposed upon plaintiff, under the rules, to tram by hand while the wire was in a defective condition. Upon this point the court charged:

"It was the duty of the deceased to exercise ordinary care; that is, such care as an ordinarily prudent person would exercise under like circumstances. It was not the duty of the deceased to inspect for himself. He had a right to presume that the defendant would not, by its own want of care, expose him to danger; and it was the duty of the deceased to continue his work as he always had done, unless he knew, or should have known, that the connections were out of order and were dangerous and unsafe; and by continuing his work he assumed no risk which was known, or should have been known, to the defendant, and of which the deceased was ignorant, or was not fully apparent to him. * * * The testimony on that branch of the case is in direct conflict, gentlemen, and I cannot assist you at all in determining the fact; but it will be necessary for you to determine the fact as to whether the deceased was going along at his business in the ordinary way. If he was, and if he did not have knowledge of the dangerous condition of that wire and assume the risk himself, and you find that the company was negligent in leaving it in the place it did, the plaintiff in this case is entitled to recover all damages that he suffered."

While defendant's seventh request was for a directed verdict, and was therefore, under our view of the case, properly denied, we think the court should have instructed the jury that if decedent knew, or, in the exercise of ordinary care, should have known, of the defect in the wire, it was his duty, under the rules, to have pushed the cars by hand past the defect; and that if, being chargeable

with such knowledge, he used the electric power, he assumed the risk of such use, and no recovery could follow.

Upon the question of defendant's duty the court charged:

"It was the duty of the defendant to furnish the deceased a reasonably safe place in which to work; and the failure of the defendant so to do would render the defendant liable for all of the damages sustained, if the deceased was in the exercise of ordinary care at the time he sustained the injury. * * * The degree of hazard attending the use of a dangerous article has a direct relation to the care which is requisite in its use, and the use of electricity imposes the duty of the greatest possible care. I therefore charge you that it was the duty of the defendant to use the greatest possible care in maintaining the car, clamp, or connection, whereby said trolley wire was attached to the bracket by which it was suspended, in a reasonably safe condition; and if you find from the evidence that the defendant did not use the greatest possible care in that regard, I charge you that in such case the defendant was guilty of negligence; and if you find that the deceased received an injury resulting in his death as a result of the failure of the defendant to exercise the greatest possible care, and without negligence on his part, your verdict should be for the plaintiff."

Error is assigned upon this portion of the charge. It is urged that the doctrine of "safe place" does not apply; and, further, that the instruction, in any event, imposed too high a degree of care upon defendant.

We have held that the obligation to inspect (and repair) appliances is one not of insurance but of diligence. *Clark* v. *Goldie*, 146 Mich. 303 (109 N. W. 1044). This duty is undoubtedly greater where the mechanism or agency employed is highly hazardous; but, giving due consideration to the character of the agency, the duty imposed is, after all, "ordinary care," and not "the greatest possible care."

Error is assigned upon the denial of the motion for a new trial, based, *inter alia*, upon the ground that the verdict was excessive. As the case must go down for an-

other trial, consideration should be given this assignment.

Based upon the evidence of his past contributions to his family, it was shown that decedent, if he had kept up such contributions during his entire expectancy, would have contributed the sum of $1,276.22. No computation of the present value of this sum was made; plaintiff's counsel claiming that plaintiff was not limited in his recovery to this amount. The verdict was for $5,040. Respecting the measure of damages, the court charged:

" In determining this question—that is, as to the sum of money—you are to consider the age of the deceased at the time of his death, his habits of industry, his ability to labor, his capacity to earn money, the wages he was in the habit of earning when he died, the amount he had been in the habit of contributing to his family, the length of time he probably would have lived had he not been killed, his possible death, his possible illness, his possible want of employment, the effect upon his earning capacity of his advancing years, the expectation of the lives of the members of his family, and all other facts and circumstances bearing upon this branch of the case."

This instruction correctly states the law as applicable to the facts in this case. It is, we think, entirely clear that the jury failed to follow it.

In defending the verdict as it stands, plaintiff cites and relies upon the case of *Ingersoll* v. *Railway Co.*, 163 Mich. 268 (128 N. W. 227, 32 L. R. A. [N. S.] 362), where this court, speaking through Mr. Justice STONE, said:

" The circuit judge should have permitted the case to go to the jury under the proposed evidence, to determine as to the liability of the defendant; and, if any was found, to assess damages, if any, for the contributions, voluntary or forced, that would probably have been made by deceased in favor of the widow during her probable life, if not exceeding the probable life of decedent, and for the child during its minority."

An examination of the whole opinion will at once demonstrate that it is not applicable to the facts in the case at

bar.   In that case the husband had repudiated his marital obligations and died without ever contributing a penny to the support of his wife or child.   Here the husband recognized his obligation, and the evidence shows with unusual certainty exactly to what extent the family of decedent was pecuniarily injured by his death.   Where, as in the instant case, the evidence establishes the pecuniary loss with reasonable certainty, the jury, in assessing the damages, should be governed by the evidence.   As was said in *Cooper* v. *Railway Co.*, 66 Mich. 261 (33 N. W. 306, 11 Am. St. Rep. 482):

" The statute authorizes the jury, in every case of this kind, to give such amount of damages as they shall deem fair and just to the persons who may be entitled to the same when recovered.   Under this statute the jury are not warranted in giving damages not founded upon the testimony, or beyond the measure of compensation for the injury inflicted.   They cannot give damages founded upon their fancy, or based upon visionary estimates of probabilities or chances."

See, also, *Chicago, etc., R. Co.* v. *Bayfield*, 37 Mich. 205; *Balch* v. *Railroad Co.*, 67 Mich. 394 (34 N. W. 884); *McDonnell* v. *Drug Co.*, 170 Mich. 291 (136 N. W. 383).

The other errors assigned require no discussion.

The judgment is reversed, and a new trial ordered.

STEERE, C. J., and MOORE, MCALVAY, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.