CONNER *v.* LAKE SHORE & MICHIGAN SOUTHERN RAIL-
WAY CO.

NEGLIGENCE—OBVIOUS RISKS—CONTRIBUTORY NEGLIGENCE.

The plaintiff was injured by catching his foot under the pilot
of a locomotive which he, with other employés, was turning
on a turntable. He had previously complained to a superior
agent of the defendant that the handles of the push bar were
too near the pilot, and the agent had assured him that the
defect complained of should be remedied. By turning the
engine in the opposite direction no danger would have been
incurred, and the evidence tended to show that plaintiff
knew and appreciated the advantage of the safer method of
operation. *Held,* that it was his duty to select the safer
method, and failure to do so bars his recovery. BLAIR, C. J.,
and MOORE, J., holding that the question was one for the
jury.

Error to Lenawee; Chester, J. Submitted June 18,
1909. (Docket No. 107.) Decided December 10, 1909.

Case by Thomas G. Conner against the Lake Shore &
Michigan Southern Railway Company for personal in-
juries. A judgment for plaintiff is reviewed by defend-
ant on writ of error. Reversed.

*Herbert R. Clark,* for appellant.

*Smith, Baldwin & Alexander,* for appellee.

BROOKE, J. This is an action to recover damages for
personal injuries sustained by the plaintiff on March 14,
1904, while assisting in turning an engine on defendant's
turntable located at Adrian. Plaintiff had been in de-
fendant's employ since 1888, first as a carpenter, then in
the waterworks department, and finally, for the four years
preceding his injury, as machinist, making general repairs
on locomotives in the roundhouse. The turntable con-
nected with the roundhouse had for years been difficult to

operate because of the fact that it had been built to carry lighter engines than those in use on the defendant company's lines at the time of the injury to plaintiff. This extra weight had a tendency to press downward the ends of the table, causing the small wheels under each end to rest heavily on the circular rail inside the pit and sometimes to bind. When this situation developed, and it appears to have done so every day and sometimes many times each day, it was the custom of the hostler and his helper to call to their aid other employés in and about the roundhouse, including plaintiff. He testifies that, during all the time he worked in the roundhouse, it was customary for him to help in turning engines when called upon; that he understood the mechanism of the table, and was as familiar as anybody with its operation and surroundings, including the approaching tracks. In the fall preceding, the table had been repaired and strengthened. In this process its surface was raised to a height of about four inches above the connecting rails leading to it. These connecting rails were thereupon raised up to the proper level; but no additional ballast was at that time placed between them. The depression caused by the lifting of the approaching tracks was soon filled, however, with snow thrown from the pit and with cinders from the engine smokestacks. So long as the weather remained cold, this operated as well as if it had been properly ballasted. In March, shortly before the plaintiff was injured, warm weather came on, causing the ice and snow to melt. This left in places between the rails depressions about four inches lower than the bottom of the rail. A push-bar was attached to either end of the table at a proper height for the men to push upon and long enough so that two, three, or even four, might reach it. In turning engine No. 50 (the one which caused the injury), it was necessary to so place it upon the table that the pilot extended about its entire length beyond the edge of the table and alongside the push-bar at that end of the

table. This left but a narrow space between the pilot and the push-bar. In turning the engine in one direction, the men would stand between the push-bar and the projecting pilot, and, as the table revolved, the pilot would follow along behind the men in close proximity to their heels. In turning it in the other direction, the push-bar would be between the men and the pilot; the pilot swinging around in front of the pushing men.

The plaintiff described the accident as follows:

"On this night in question, I was called out to help on this turntable. It was in the evening, after dark. It was a dark night. There wasn't any lights around the turntable. They had engine 50 on the turntable. The trouble was they couldn't turn the engine; but the causes for the trouble was sometimes one thing and sometimes another. The causes that time was they couldn't turn the engine; but generally the trouble would be—that is, it would sometimes, in balancing these engines on the turntable, they—the condition that the turntable was left in. We would run an engine on the turntable and balance it, and by—as soon as we would have it balanced, why, the pilot would come down on top of the approaching rails to the turntable and stick, so that we couldn't move it. It was rigid and fast. We would then be obliged to back the engine up far enough to raise the pilot above the rails so that it would swing out over, back it back on to the end, and throw the weight on one end, and then it was almost impossible for us to turn it at all. Sometimes we would and sometimes we wouldn't, and sometimes we'd get them balanced so that they wouldn't—the pilot would happen to be a little higher, and it wouldn't hit the rails, then it would hit high places in the circular rail. The engine would bear down so heavy on the circle rail that it would tighten on that end and be impossible to turn it. There were various causes that— When I got out there that night, the pilot of the engine was headed towards the roundhouse. It was standing about northwest. The pilot was overreaching the turntable just as far as it could and keep the wheels on the table. The pilot would probably extend about 5, 5½ feet over these tracks on the outside. It would depend somewhat on the length of the pilot. There were various lengths of the pilot. That engine had a long pilot, I should judge 5 or 5½ feet

long.   If I recollect right, the engine was stuck so that you could (not) move it, and we moved it back to the south a ways to get a kind of run on it.   It was necessary most of the time to get speed on it with what help we had to get around with it.   We would get started and strike those rails, and we couldn't get around with it, and it was necessary to put speed on.   We would move it as fast as we could, and that would help it over these bad places.   I had hold of this push-bar inside next to the turntable pit.   We were on the northwest corner of the table. That is where we were pushing.   I was standing in between the engine and the handle.   I had hold of the handle.   It was about $3\frac{1}{2}$ feet, probably, above the top of the rails.   Frank Beyer had hold of the bar with me.   I don't know for sure who were at the other push-bar, at the other end of the table; but I think there were four men at the end that I was on. There was one man with me; the other two being behind the pilot.   I don't remember who they were; that is, there was the hostler's helper, if I remember right, and the other was a man that worked in the roundhouse that night. After we got the engine pushed back south, we started it toward the north again.   We weren't going very fast, maybe at the beginning as fast as a man would walk. Sometimes you would have to reach quite a ways to get a step, and sometimes you wouldn't.   Your steps were a good deal as you could get them.

"*Q.* Yes.   Well, now, as you were going around to the east and pushing on that bar, just tell the jury what took place.

"*A.* Well, I—the pilot caught my foot, and—

"*Q.* Well, now, just how did that—now, how were you caught, and where were you caught?

"*A.* Well, I was leaning forward at an angle, probably about 45, pushing on this bar, and stepping along over the rails, and the pilot was swinging right around close to the top of the rails, swinging right around after me, and I stepped over a rail onto the ground, and the pilot—I didn't step away quick enough so but what the pilot—come right on top of my foot, my right foot, up above my heel a little ways, and as it was coming along I hung onto this bar. As the pilot was pushing me along, I hung onto this bar, and I put my left foot right back of me onto the pilot, and as it turned a little bit it turned my foot so that it broke loose, and I pulled it out; that is, I pulled it as the engine kept a going.   And I think we came to a stop after I got

out; but I couldn't say, as the engine stopped going, but I—when I was fast I called to the fellows to stop, hollered, 'My foot is fast,' and of course I was trying to get out, and I—

"*Q.* Well, now, was there space enough there at that time under that pilot so that it,—where did it catch your foot, if it did?

"*A.* Well, it caught me right on the top of the heel there, right just up above my heel.

"*Q.* Well, now, where was that? Was that clear under the pilot?

"*A.* Yes, sir; my foot was under the pilot, and it went far enough so that it turned my foot over, turned my toe, straightened it out back, and, as it came around, it was a circle, and it released me a little, and I pulled, and pulled it out.

"*Q.* Yes. What was the condition there, where your foot—where you got caught in that place?

"*A.* Well, there was—the condition was that there was a hole there sufficiently large enough to leave my foot go low enough so that the pilot would come over on top of it.

"*Q.* Well, now, the—previous to the time that you were injured, or the last time that you had helped turn an engine around on there, was there any such hole there?

"*A.* I don't understand what you mean.

"*Q.* I say, previous to the time that you were injured, or the last time before you—the time that you were injured, when you had helped to push an engine around there, was that hole there?

"*A.* No.

"*Q.* Did that hole exist?

"*A.* No, I didn't know that any holes was there at that time, it was the—the last time that I was out there would be probably several days before. I don't just remember when it was, but there was no holes there the last time I was there.

"*Q.* Yes, and the last time that you had helped to move an engine around there previous to the time that you were injured, was there any such place as this hole where you could get your foot caught under the pilot?

"*A.* No, sir; there wasn't.

"*Q.* And at the time that you were injured and caught there, did you have any knowledge that that hole existed there?

"*A.* No, sir; I didn't."

On cross-examination witness testified that, in the absence of Mr. Duerr, he looked after things at the round house by request of the management. He also testified that the hole or depression between the rails in which his foot was at the time of the accident had not been observed by him before that time, and he had not complained to any one of the lack of ballast about the table, but that he had frequently complained to Mr. Hogue of the bad condition of the table, and upon one occasion, a week or two before his injury, he complained to Mr. Hogue about the location of the push-bars, that they came straight out (parallel with the tracks on the table), thereby bringing the men too close to the pilot. Upon the occasion of each complaint, plaintiff claims to have received general assurances from Mr. Hogue that "he would have this work attended to."

The plaintiff claimed, and the learned circuit judge agreed with him, that he had a right to go to the jury as to whether or not the handles or push-bars were put on at the proper angle, and, if they were not, then whether complaint was made to the proper officer, and whether a promise to repair was given and relied upon by plaintiff in continuing to use the appliance. The defendant requested the court to direct a verdict in its favor upon the ground that it was conceded that the turntable would turn in either direction with equal facility, and that the plaintiff had chosen the dangerous, rather than the safe, method of operation. The court refused to direct a verdict for defendant, but charged the jury upon this point as follows:

"You are also instructed that if there were two methods, or two ways, of using this turntable in question, or two ways in which it could be turned, one of which was safe and one of which was dangerous, both of which were known to plaintiff, then, under those circumstances, it was the duty of the plaintiff to select the safer method, and if he did not do so he cannot recover for the injury sustained upon this claimed ground of negligence."

Upon the examination of Henry Duerr, a witness produced by the defendant, the following occurred:

"By *Mr. Clark,* counsel for defendant:

"*Q.* Now you may state whether or not that table would turn either way.

"*A.* Certainly it will.

"*Q.* Did you sometimes turn engines one way and sometimes the other?

"*A.* Yes, sir.

"*Mr. Smith* (counsel for plaintiff): Just half a second, Mr. Clark. I, of course, haven't been here. Is there a claim on our part that it couldn't be done both ways?

"*Mr. Clark:* No, I guess not.

"*The Court:* No.

"*Mr. Clark:* I haven't so understood it. Mr. Conner testified that it could.

"*Mr. Smith:* Well, I was wondering why you were proving it.

"*The Court:* Well, it is possibly conceded here that this table would go either way.

"*Mr. Clark:* Well, is it so conceded?

"*Mr. Baldwin* (also counsel for plaintiff): Why, it would go either way, of course, with sufficient help. That is the only question.

"*Mr. Smith:* Well, was there any difference in the power that it took to turn it one way or another?

"*Mr. Baldwin:* No.

"*Mr. Smith:* Like a street car, go just as well one way as the other, as I understood it; but that is why I inquired."

We have, then, this clear and unequivocal admission that the table turned with equal facility in either direction. Is it equally clear that to turn it in one direction involved the taking of risk, while to turn it in the other there was no such risk? We think it is. It is entirely obvious that, had the engine been moved in the opposite direction, the pilot would have been in front of the plaintiff and his companions, and could not have caused his injury. The plaintiff himself, too, seems to have recognized and appreciated the danger, for he made complaint about the position of the push-bars, and testifies that others of the men had complained to him that the following pilot was too close. Upon the authority of *Davey* v. *Hall & Munson Co.,* 122 Mich. 206 (80 N. W. 1082), and cases there cited,

the defendant was entitled to the direction of a verdict in its favor, and the judgment must be reversed upon that ground, provided the record is in such shape as to warrant it.

It is urged on the part of the plaintiff that the certificate of the circuit judge to the bill of exceptions does not comply with Circuit Court Rule 47d, in that it fails to state that the bill contains all or the substance of all the testimony. A careful examination of the record seems to bring it within the rule laid down in *Godkin* v. *Obenauer*, 113 Mich. 94 (71 N. W. 456), and cases there cited. Particular attention is directed to *Ironwood Store Co.* v. *Harrison*, 75 Mich. 197 (42 N. W. 808), where the record seems to have been in all essential points identical with the one under consideration.

Judgment reversed, and a new trial ordered.

Grant and McAlvay, JJ., concurred with Brooke, J.

Blair, C. J. I concur in the result. I think, however, that the facts in the record present a case for the jury if presented upon the proper theory.

Moore, J., concurred with Blair, C. J.