## LUKOVSKI *v.* MICHIGAN CENTRAL RAILROAD CO.

1. MASTER AND SERVANT — RISKS ASSUMED — PROMISE TO REPAIR. Plaintiff was employed by defendant to load coal on its engines by means of a derrick and numerous buckets. The method of dumping full buckets was to release a spring held by a wedge in the bottom, which then turned on a rod and dumped the coal. Occasionally buckets dumped prematurely. It was customary for plaintiff to write to his foreman at another town when there were buckets in need of repair, and men were sent to repair them. Plaintiff wrote less than two weeks before his injury that certain buckets were out of repair. He was injured by the premature dumping of one of the buckets which he seized with his hand instead of using a rope attached to the chain which held it. The evidence did not show that he supposed it was a defective bucket when he used it. *Held*, that plaintiff did not know the bucket was out of order and sent no notice concerning it, and therefore no promise to repair it could be inferred.

2. SAME—ASSUMPTION OF RISK—NOTICE.

> Since plaintiff knew that the buckets of coal frequently dumped when they struck the side of the tender, and that he could and did, at any time when a bucket was out of repair, set it aside, he was bound to make a reasonable inspection of the appliance, and assumed the risk of their striking the car and dumping.

3. SAME—ADOPTION OF UNSAFE METHOD OF OPERATION.

> Where two methods of guiding the bucket were apparent, and it was safe to use a rope attached to it, and it was dangerous to guide the bucket by hand, plaintiff could not recover for injuries received as a result of choosing the more dangerous way.

Error to Otsego; Sharpe, J. Submitted October 11, 1910. (Docket No. 33.) Decided February 1, 1911.

Case by John Lukovski against the Michigan Central Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Cooley & Hewitt* ( *Watts S. Humphrey* and *Humphrey, Grant & Baker*, of counsel), for appellant.

*De Vere Hall*, for appellee.

This is an action for personal injuries sustained by plaintiff while an employé of defendant company at Vanderbilt. It appears that defendant maintains at that place a coal dock, from which, as required, engines upon that portion of its lines receive coal. Plaintiff was foreman of the gang at that point, there being no one in authority over him at Vanderbilt. This dock was about 25 by 50 feet in size, and between 4 and 5 feet high. The coal was piled loosely upon the dock and was transferred from the dock to the engine tenders by means of iron buckets. These buckets were round, and about three feet in diameter and four feet high. Each one held about half a ton. The bottom of the bucket swung open and shut upon a rod or hinge which passed across it about one-third of the distance from back to front. When closed, the bottom

was held in place by means of a flat steel spring which was riveted to the front of the bucket, and passed inside an iron hoop or band at the bottom. This spring had a lip at the lower end about one-half inch deep, which, when the bottom was closed, caught it and held it in place. To prevent the spring from pushing out and so releasing the bottom, iron wedges were supplied, attached by a chain to the bucket, which were driven between the iron hoop at the bottom and the back of the spring. The bucket had a bail from which a chain ran to a pulley which was used in hoisting. Air from the engine was used as power. Attached to the chain near the bucket bail was a rope about 25 feet long, one end of which was intended to be used by the fireman upon the tender for the purpose of drawing the bucket over the tender when at a proper height. The other end was for the use of a man on the dock to enable him to steady the bucket as it was raised and to prevent it from striking the side of the tender, and to draw the bucket back when empty. The defendant had furnished 16 of these buckets for use at this point, 4 of which had been found defective by the coaling crew, and were not in use. The other 12 were in use on the day plaintiff was injured. They were all full when he started work in the morning. Plaintiff himself was in charge of the coaling operation when injured. He attached the chain to the bail of the bucket which caused his injury.

He testifies:

"When the bucket was going up, I grabbed it to keep it from striking the side of the tender. When the bucket struck the engine tender, the wedge came out, and the bottom came down and caught my hand."

With reference to the use of the rope, he testified:

"There was no rope on the bucket for a man to hold onto it with. There was a rope tied to the chain that fastened the bucket. It was one rope tied through the middle. One end of it would be taken by the man who stood on the dock coaling and the other end by the man on the tender.

"*Q.* And those two ropes were for the purpose of steering the bucket up onto the engine, were they not?

"*A.* No.

"*Q.* What were they for?

"*A.* Well, when the bucket was filled and hoisted, one was used to pull the bucket over on the engine, and the other was after it was emptied to pull the bucket back on the dock.

"*Q.* Well, the same rope that would pull the bucket back onto the dock, you could hold onto, couldn't you, when it was going up?

"*A.* Couldn't hold the bucket when it was going up.

"*Q.* Couldn't you hold it with the rope just as well as with your hands?

"*A.* No.

"*Q.* Why?

"*A.* When you take hold of the bucket, you could hold it back. When you take hold of the rope, it would swing. After the coal was dumped, we would pull the bucket back until it hung straight over the dock and then let it down. When they would give the bucket a sudden jerk, sometimes the jar would cause the bucket to empty.

"*Q.* Well, if the coal held in the bucket when it first came up, it wouldn't dump then unless it struck something, would it?

"*A.* If it was in good shape and the springs were right, it wouldn't.

"*Q.* And if the wedge set in there?

"*A.* Sometimes the wedge would stay in, and it would drop out.

"*Q.* When they first jerked it up?

"*A.* Sometimes whether the wedge would be in or not, it would come out.

"*Q.* Come out? Did that happen very often?

"*A.* Not very often.

"*Q.* How often would it happen in the course of a month?

"*A.* If the bucket was in good shape, sometimes it wouldn't happen over once in two weeks."

Paul Ososki, a witness for plaintiff, upon the same subject, testified:

"*Q.* How would you keep it away?

"*A.* Of course, before when John was hit, we held

with the hand, and, when we know that he was hit, we hold with the rope.

"*Q.* Where did you put the rope?

"*A.* On top of the chain. Of course, you put it on, and there was hook, and after the hook was a rope.

"*Q.* Now, was the rope ever used there to keep it away before John was hurt?

"*A.* Yes, sir; the rope was used every time.

"*Q.* Before or after?

"*A.* Before and after.

"*Q.* How would you keep it away before he got hurt?

"*A.* Lots of time with the hand. Of course, I don't know. Nobody was told us until John was hurt, and after that we know better, and we keep with the rope.
\* \* \*

"*Q.* When you first went there, they used these ropes to keep the buckets away from hitting the engine, did they?

"*A.* When I first started, they got two ropes on that chain. One was used the brakeman on the tender, and the next one I use it.

"*Q.* Yes; and you used to use it to keep the bucket from striking the engine, didn't you?

"*A.* Yes; I keep that off too.

"*Q.* How much of the time that you worked there were the ropes used for that purpose?

"*A.* I use them right along.

"*Q.* And did you work daytimes with John?

"*A.* Yes.

"*Q.* And, when you handled the buckets, did you do it with the rope?

"*A.* I pull up pretty near all the time with the rope, and sometimes I can't do with the rope, of course, before John was hurt, why I catch with the hand, too.

"*Q.* Sometimes you wouldn't touch the rope, but would do it with your hands?

"*A.* Yes; I can't do with the rope, of course, swung around. I couldn't do with the rope, and I touched them with my hand, of course, before John was hurt, and after John was hurt I do just with the rope.

"*Q.* You never touched it with your hands?

"*A.* Not after that; no, I was scared."

With reference to discarding broken buckets, plaintiff testified:

"*Q.* Now, if one of the other 12 had been broken, you would have set that to one side, wouldn't you?

"*A.* Yes; I would set it aside.

"*Q.* Whenever there was any of them broken, you stood them aside and didn't use them?

"*A.* Whenever any of them would get fixed, I would replace some that were broken.

"*Q.* Now, the night men would do the same, wouldn't they?

"*A.* Yes, sir.

"*Q.* If they saw a broken bucket, they would set it aside?

"*A.* Yes, sir; if there was any that was set aside and was all right.

"*Q.* Well, suppose there were no good ones there, and these twelve had one broken, what would you do with it?

"*A.* I would fire it out, too.

"*Q.* Yes; and each one of you men that were working on the dock at night and in the daytime would do the same thing, wouldn't they?

"*A.* There was different kinds of men. Some would do it and others would not.

"*Q.* Yes; well, if they did what they ought to do, they would do it, wouldn't they?

"*A.* Yes; but they all won't give the attention that was necessary."

Thomas Malak, plaintiff's witness, who filled the buckets the night before, testified:

"The twelve buckets that were filled with coal had been filled by me along the night before the accident.

"*Q.* And, when you filled them the night before, did you see any of them that wasn't fit to use?

"*A.* No; I didn't see them.

"*Q.* You thought that they were all in good repair, and fit to use, didn't you?

"*A.* Yes; I thought that they were good, for I didn't see anything wrong with them at that time."

Brooke, J. (*after stating the facts*). The negligence of the defendant relied upon by the plaintiff is:

"In that it omitted to furnish, provide, and maintain for use in elevating such coal to the tenders of said engines buckets having springs thereon reasonably fit and safe for use."

Plaintiff testified that, when buckets were out of repair, he would tell the agent or operator at Vanderbilt to write a letter to Phil Coll at Bay City. Coll was foreman of the coal heavers; that from time to time Coll would send men to repair the defective buckets. Plaintiff further testified that he ordered such a letter to be sent on March 18th prior to the date of his injury on March 30th, but that Coll had sent no one to repair the buckets in the interval.

In our view of this question, it is immaterial whether plaintiff properly proved the notice to repair or not, or whether, by reason of custom, he had a right to rely upon an implied promise to repair. The reason for this conclusion is that it is apparent from the record that neither plaintiff nor any member of the gang knew that the particular bucket which caused the injury was out of repair. It was in use up to the moment of the accident, and all witnesses agree that, when found out of repair, the buckets were set aside to await the arrival of the man who would fix them. The notice to repair, therefore, even if sent and received, had absolutely no reference to this bucket.

Did plaintiff assume the risk? It is clear from the record that a bucket in perfect repair would occasionally dump prematurely, particularly when hoisted too rapidly, or when it was permitted to strike the side of the tender. This situation seems to have been known and appreciated by all those familiar with the operation of the buckets. The plaintiff himself was chargeable with the knowledge, and was bound to govern himself accordingly. The appliance was of the simplest and most elementary character, easily understood, and constantly under the supervision and control of the plaintiff who could, at any moment, set aside any bucket found out of repair. Under these circumstances, it was the duty of the plaintiff to make such examination as he deemed necessary to assure his own safety. In using the buckets he assumed the risk. *Fischer* v. *Goldie*, 132 Mich. 574 (94 N. W. 5);

*Juchatz* v. *Alkali Co.*, 120 Mich. 654 (79 N. W. 907);
*Dolan* v. *Atwater*, 167 Mass. 274 (45 N. E. 742);
*Lamotte* v. *Boyce*, 105 Mich. 545 (63 N. W. 517);
*Younggren* v. *I. Stephenson Co.*, 150 Mich. 488 (114 N.
W. 341); *Wheeler* v. *Berry*, 95 Mich. 250 (54 N. W.
876); *Bauer* v. *Foundry Co.*, 132 Mich. 537 (94 N. W.
9); *Lynch* v. *Traction Co.*, 153 Mich. 174 (116 N. W.
983, 21 L. R. A. [N. S.] 774); *Bays* v. *Featherbone Co.*,
131 Mich. 205 (91 N. W. 164): *Clark* v. *Goldie*, 146
Mich. 303 (109 N. W. 1044).

Another reason exists, however, why plaintiff cannot
recover. The record discloses that the defendant had
provided a rope to be attached to the chain above the bail,
by means of which plaintiff might, if he had chosen, have
held the bucket steady as it was elevated, instead of using
his hands for that purpose. His fellow employés used the
rope part of the time before his injury. Since that time
all of them use it all the time. Where two methods are
open for the performance of a duty, one dangerous and the
other safe for the operator, one who chooses the dangerous
method rather than the safe will be precluded from re-
covery. *Davey* v. *Hall & Munson Co.*, 122 Mich. 206
(80 N. W. 1082); *Deering* v. *Canfield & Wheeler Co.*,
126 Mich. 373 (85 N. W. 874); *Mulholland* v. *Manufac-
turing Co.*, 149 Mich. 126 (112 N. W. 483); *Conner* v.
*Railway Co.*, 158 Mich. 688 (123 N. W. 533).

The judgment is reversed, and a new trial ordered.

OSTRANDER, C. J., and BIRD, BLAIR, and STONE, JJ.,
concurred.