# JANUARY TERM, 1914.*

## CHARTERS v. INDUSTRIAL WORKS.

1. MASTER AND SERVANT—RAILROADS—CONTRIBUTORY NEGLIGENCE.
   It was negligence that would preclude plaintiff from recovering for injuries sustained in his employment as defendant's freight conductor, to pass between an approaching car and a pile of iron, of the existence and location of which he was aware, in the dark, after his lantern had been blown out, and without stopping to relight it; several other safe ways of doing the work he was performing being available.

2. SAME—ADOPTING MORE DANGEROUS WAY—NEGLIGENCE.
   A servant is guilty of negligence for selecting the more dangerous of two methods of discharging his duty, one of which is comparatively safe.

3. SAME—PROXIMATE CAUSE—INTERVENING CAUSE.
   Where plaintiff voluntarily walked up a railroad track, in the dark, towards an approaching car, without stopping to light his lantern which had gone out, the extinguishment of the lantern was not the proximate cause of his injury.

4. PLEADING—JOINDER OF CAUSES—DECLARATION.
   On distinct and independent torts of a similar nature, plaintiff may declare jointly, but if both counts are submitted to the jury, one, erroneously, a mistrial results, which will require the court on error to reverse the judgment.

5. MASTER AND SERVANT — CONTRIBUTORY NEGLIGENCE — FELLOW-SERVANTS—INCOMPETENCY.
   Evidence considered and *held*, to present issues of fact relative to the incompetency of plaintiff's fellow-servant, contributory negligence, and the knowledge by plaintiff

---

* Continued from Vol. 178.

of such alleged incompetency; evidence that plaintiff rode on the crane which caused his injury, to expedite his work, that it was customary to so ride, and that his superior servant had directed him to do so, tended to support his claim that he exercised due care.

Error to Bay; Collins, J. Submitted November 24, 1913. (Docket No. 116.) Decided March 26, 1914.

Case by Judson S. Charters against the Industrial Works, a corporation, for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Gillett & Clark*, for appellant.

*Hall, De Foe & Hall*, for appellee.

STONE, J. This is a personal injury case involving two separate and distinct injuries. The alleged injuries occurred more than a year apart, and had no connection with each other, so that the case presents practically two cases in one. The negligence charged relating to the first injury was the furnishing of an improper lantern to the plaintiff by the defendant; while the negligence charged relating to the second injury was the employment and retention of an incompetent, careless, and reckless fellow-servant, to wit, an engineer.

The first injury is alleged to have occurred on, to wit, November 11, 1909, and the second on, to wit, May 31, 1911, at Bay City, in the yards of the defendant's factory, where were manufactured railroad cranes, railroad equipment, and other heavy machinery, and where were maintained switching tracks, traveling cranes propelled by steam power, and used as locomotives to move freight cars about the yards, and as derricks for lifting and moving heavy objects as necessity required; that switching operations were carried on in such yards in the nighttime by a crew

of men employed for such night shift or work, who were provided with lanterns to enable them to perform such work.

The undisputed evidence shows that plaintiff commenced working for the defendant on or about September 7, 1909. He went to work first as a member of the yard gang, containing 35 or 40 men, who worked outdoors in the yard connecting the various buildings. A part of the equipment of the yard gang consisted of two locomotive cranes, called, respectively, "Big Sandy" and the "Joe." In the fall of 1909 these two cranes were working on the night shift. Each of these cranes had a crew of three men, consisting of the conductor, engineer, and brakeman. The engineer stayed in the cab of the machine; the conductor stayed on the ground, and had charge of the operations of the crane, giving orders to the engineer and brakeman; while the brakeman also stayed on the ground, and acted as a helper to the conductor. In addition to the lifting work, the cranes took the place of yard engines in moving cars about the yards.

Referring to the first alleged injury, it may be stated that after a short preliminary service on the day crew plaintiff commenced working on the night crew in the fall of 1909, and was given the position of conductor on the "Big Sandy." His brother, Fred Charters, was brakeman, and the engineer was one William Redmond. It was part of plaintiff's duty, as conductor, to take charge of the operations in the yard on the night shift. In order to furnish light for the night work, the defendant had installed an elaborate lighting system, consisting of a power house, steam engine, and generator, and a system of arc lights situated at different points in the yard. In addition to these lights, the conductor and brakeman on the crane also had lanterns which they carried with them in doing their work. There was a sharp conflict in the evidence in regard to the condition of

the arc lights, and the amount of light which they gave while burning. This question, however, is of minor importance, inasmuch as the negligence complained of, which was finally relied upon at the trial, was not based upon any insufficiency in these stationary lights, but upon the alleged defective character of the hand lantern which plaintiff was using on the night of the alleged injury. Upon that subject the declaration, after alleging the duty of the defendant, averred that the defendant, not regarding its duties, then and there carelessly, negligently, and wrongfully did fail and omit to perform its said several duties in that behalf, in the following particulars:

(5) "In that it failed to provide, furnish, and supply plaintiff and its other employees, working about such yards in the nighttime, with suitable and sufficient lights so that they might carry on their work with reasonable safety, and be able to distinguish objects upon, along, and near such tracks, although said defendant had often promised plaintiff so to do, and assured plaintiff and its other employees that, if they would continue to work with such lights as were then provided, other and suitable and safe lights would be provided in the immediate future."

(6) "In that it failed to furnish and supply plaintiff working about such yards in the nighttime with a lantern so constructed that the light therein would not be extinguished by an ordinary draft of wind, but, on the contrary, provided plaintiff with a certain lantern so constructed that the light therein would be extinguished by ordinary drafts of wind."

The 1909 injury is claimed to have resulted from plaintiff being pinched between a box car and a pile of iron pile driver weights standing near one of defendant's private tracks in the yard. These tracks were of standard gauge, and connected with the public tracks in the street, so that freight cars could be taken in and out of the yard for loading and unloading; but all such switching operations were carried on by the locomotive cranes operated by the defend-

ant's yard gang, and not by the railroad company. Some of these tracks were used more than others, and the ground adjoining all of them was used as a general piling ground for heavy material of various kinds which had to be handled by the cranes.

This alleged injury is somewhat extraordinary in that, although plaintiff claims that it resulted in serious injury to him, it is not claimed that it was brought to the attention of the defendant's officers or the yard foreman at the time, and they knew nothing whatever about it until after the second injury, and the threatened litigation resulting therefrom. Plaintiff did not stop work on the night of the 1909 injury, or on the succeeding days, and, inasmuch as there was no other eyewitness of the accident, the plaintiff's testimony must be looked to to ascertain the facts. He claimed and testified on the trial that he had ordered the engineer to move a freight car away from the foundry, so that another car could be placed for unloading. The car to be moved away was a wide box car loaded with coke. The point to which it was to be moved was just below or south of a "diamond" at the junction of two tracks called the "Boiler Shop Track," running east and west, and the "Yard Track," running in a northeasterly and southwesterly direction, so that the movement of the car on the yard track was substantially from northeast to southwest. He testified that the arc lights were not burning; that it was dark and rainy, and that, after going from the yard foreman's office to the point where the car was expected to stop, to wit, the diamond, and not finding it there, he started walking close beside the track, and on the easterly side thereof, toward the northeast, from which direction the car was coming; that, after crossing the diamond, his lantern blew out, and that, after stopping a moment, he continued to walk in the dark towards the approaching car, and so close to the track that he was

caught between the car and the weights piled beside the yard track. This car was being moved by the crane called "Big Sandy," which was geared to run at a rate of speed not to exceed four miles an hour, and the evidence tends to show that the car was moving at a rate of from three to four miles an hour; the car being ahead, and being pushed by the crane in approaching the diamond. The plaintiff testified that he knew that the weights were there, and that he had worked in that vicinity loading and unloading iron on frequent prior occasions. He also testified that he noticed the weights, and knew that he was alongside of them, and had walked alongside of them for half their length before he was caught by the car. The only negligence claimed upon the final submission of the case was in respect to the lantern. This appears by the charge of the court very clearly, as is shown by the following excerpt therefrom:

"You will observe, gentlemen of the jury, with respect to this claim, that the only claimed negligence on the part of the plaintiff is negligence in respect to the lantern, so that upon the subject of this accident you will not consider any claim of negligence except a claim based on the failure to furnish a lantern as stated in this request. I made that statement here because upon the trial there was testimony with respect to the lights, and testimony in respect to the position of some iron stuff there, pile driver hammers, I believe, or something of that kind. That is out of the case."

Relating to the injury, the plaintiff testified as follows on his direct examination:

"When the cars approached, I was looking up towards the northeast along the track. The train came from in front of me. I couldn't see very much at all because the lights were out; my light was out, and it was dark there, and I got in between the weights, and I knew they were there, but the car struck me.

"Q. When you got in between the weights so as to

know they were there, how close were you to the weights?

"*A.* Why, just close enough that I had to walk right aside of them. I walked right beside the weights as I passed them. The train hit me before I could get out of there, or know anything about it. There was no light showing on the train. I was looking right in the direction from which it came. After it was near enough so that I saw it, I did not have time or opportunity to get out of the way. I didn't have time to turn around because just as it came it caught me on this side and turned me over.

"*Q.* Why didn't you step away from the track?

"*A.* Well, I was walking along the side of the weights, and the track came along this side. I didn't have—

"*Q.* Which car came in first?

"*A.* The box car. The crane was up at the other end. At that time my lantern had gone out. * * *"

On cross-examination plaintiff testified:

"*Q.* How did you know when you got over to the diamond?

"*A.* I walked over, and my lantern was lit until I got there.

"*Q.* How far did you walk after your lantern went out?

"*A.* Just got in between the weights.

"*Q.* That doesn't answer the question as to how far you walked after your lantern went out.

"*A.* It was about 8 or 10 feet, as I can get at it.

"*Q.* How did you see to walk?

"*A.* Well, I walked up alongside of the track; that was all.

"*Q.* Could you see the track?

"*A.* I could see a shadow, to look right down.

"*Q.* See your own shadow, you mean?

"*A.* No; the track. I didn't have any light to see the track by. I knew where I was because I was across the tracks when my light was lighted. I know I was on the righthand side because I was alongside of the weights. My lantern went out at the diamond, and I stepped off the diamond, and my lantern went out. I don't remember exactly if I stepped over any rails after it went out. There was no sidewalk to

walk on, just the ground. I was on the outside of the tracks. I think the ties were covered with dirt, level. I did not stumble when I walked. I did not have any light to walk by, after the lantern went out. When I got to the pile of weights I knew I was there, because I was right aside of them. I was right up alongside of them with my clothes. I did not put out my hand and feel. I knew it was the weights because I knew by the tracks there and the "Y" that they were there. I saw that they were the weights when I got right up to them. I got right to them before I saw what they were. I brushed right—with my clothes. I was just about halfway along the weights when the car came along and caught me. They were working in the boiler shop, and the lights were lit in that shop, nothing extra bright that I know of.  *  *  *

"*Q.* Just where were you when your lantern went out? Tell us just where you were.

"*A.* I just crossed the diamond.

"*Q.* You mean by that your foot was still on the diamond, or your foot had just left it? I want to know whether you had actually stepped off the diamond or not.

"*A.* Well, I was across the diamond, and right into the corner there, and I just stopped for a moment to see if I could hear them coming.

"*Q.* Did you stop before or after your lantern went out?

"*A.* I stopped when my lantern went out; my lantern went out just as I got across the diamond, and I got right there opposite the track.

"*Q.* Your lantern did not go out until you had time enough to see the weights with the lantern, did it?

"*A.* Well, I cannot—I had my mind on the crane, and I don't remember looking at the crane just then.

"*Q.* So you don't know as you walked toward that pile of weights whether you could see them with your lantern, whether you could see them at all with anything, or whether you just by good luck walked into that little narrow space, because you didn't happen to walk against them; you don't know which it is?

"*A.* Well, if my lantern was burning, and I wasn't looking down to see if I could see the crane coming,

and I looked at them weights, I could see them from there, if it was burning.

"Q. Well, which was it?

"A. Well, I said it went out when I went across the diamond.

"Q. Did it go out before you had a chance to see the weights?

"A. I don't remember looking at the weights just then, going across there with it lit.

"Q. So it went out then before you did see the weights, did it?

"A. My lantern went out, and I don't remember seeing the weights.

"Q. Then, if you did walk in there in that spot without striking anything, you did it without any light to help, did you?

"A. There was no light; the lights were out in the yard. This car was a box car, with coke in it. I was walking along and just nicely got by, along in the weights here, brushing along like that, and the car struck me. I brushed against them, and I felt them.

"Q. And of course then you realized that there was a pretty small space you were in there, didn't you?

"A. I did when the car struck me.

"Q. You did before the car struck you, didn't you?

"A. I didn't have time to think any more than I knew I had brushed up against the weights, and the car caught me right there.

"Q. So the car must have been very close to you when you walked across the diamond, must it not?

"A. It must have been coming down all right; it caught me when I was down there.

"Q. It must have been within 10 or 15 feet when your lantern went out?

"A. I don't know how far away it was. That is, I don't know just how fast the car was coming down. I mean by that that the only thing I can say to explain that, that it caught me when I got in between the weights. I knew how the tracks were laid then. I did not need any light to keep from running against the end of these weights because I knew where I was when I got across the diamond there. I knew the weights were there. I walked right straight up—

"Q. Answer that, 'Yes' or 'No.' Did you know

where they were well enough so you could keep from running into them without seeing them?

"*A.* About that."

The undisputed evidence shows that at the time of this employment plaintiff continued to work for the defendant until September 17, 1910. He began work again on May 1, 1911, and he worked the entire month of May, except Sundays and Decoration Day, the entire month of June, except Sundays, and June 1st and 22d, and six days in July, ending with July 10, 1911.

As has been stated, the negligence charged in respect to the second injury was the employment and retention of an incompetent, careless, heedless, and reckless engineer. The declaration in the second count, after alleging the duty of the defendant, proceeded as follows:

"Yet the said defendant, not regarding its aforesaid several duties, then and there carelessly, negligently, and wrongfully did fail and omit its said several duties in the following particulars:

"(1) In that it provided and placed in control of the operation of such crane in the raising, moving, and lowering of heavy objects a certain incompetent and untrustworthy engineer, to wit, Jack Cramer.

"(2) In that it provided and placed in control of the steam brakes and other appliances by which the movement of the arm of such crane was controlled a certain careless, incompetent, and unskillful engineer, to wit, one Jack Cramer.

"(3) In that it employed and placed in control of the appliances by which said arm was operated a certain engineer and employee who was careless, heedless, and reckless, to wit, one Jack Cramer.

"(4) In that it failed to discharge from its service a certain reckless, careless, and incompetent engineer in charge of the appliances controlling the movement of the arm of such crane, to wit, one Jack Cramer."

At the time of the second employment the plaintiff was acting as brakeman in the yards. At the time of the second alleged injury the crew were unloading

boilers from a "larry" or small freight car onto the ground. The boilers were about four feet in diameter and seven to nine feet high. In lifting the boilers the men used a long rod which had an eye at the top, and a thread at the bottom, upon which a nut or burr could be screwed. Plaintiff, as brakeman, took hold of the hook hanging from the arm of the crane, and upon which the eye of the boiler rod was hung, and was lifted by the crane onto the top of the boiler to be unloaded. He then inserted the rod in one of the boiler flues near the center, and the conductor, Weaver, put his hand through the opening at the bottom and screwed the nut onto the bottom of the rod. The boiler was then lifted onto the ground, and the nut was then unscrewed, and the rod lifted out of the flue by the crane. Under ordinary circumstances, there was no occasion to unhook the boiler rod from the crane; but it was lifted from one boiler to the next without unhooking, so that, to release a boiler which had been unloaded, nothing was required except the unscrewing of the nut from the bottom of the boiler rod, which was done from the ground.

It was the contention of the defendant that therefore, although it was necessary for a man to be on top of the boiler when the rod was inserted in the flue before the boiler was lifted, it was wholly unnecessary for any one to be on top of the boiler when the boiler rod was taken out, that plaintiff did no work that was required by his position after he had fastened the boiler rod to the hook, and that, after he had placed the boiler rod in the flue, he therefore had the choice between climbing down from the boiler before it was lifted from the car or "riding the boiler" as it was called, viz.: Staying on top of it while it was lifted and placed on the ground, and then riding to the ground again on the hook. Whether ladders, or devices which could be used as ladders, were available was a disputed question; but it was undisputed and

stated by witnesses for both sides that it was possible, although somewhat difficult, for a man to climb down from the boiler, without assistance, by making use of the projections on the sides of the boiler. On the date of the second injury plaintiff remained on the boiler, instead of climbing down, and was injured while it was being lowered. It was the rule for the engineer in lifting and lowering the boilers to follow the directions given him by the conductor. There is no claim that the engineer, Cramer, disobeyed any direct signal on the date of the accident; but there is a conflict of evidence as to what extent he acted upon his own initiative, without waiting for the signal. Plaintiff and the conductor testified that the engineer lowered the boiler or dropped it, without waiting for the signal; also that he improperly lowered it with the brake, instead of the engine. The plaintiff claimed that the coupling slackened, and the block came against him and knocked him off his balance, and against another boiler, and from there he fell to the ground, that his stomach and lower ribs struck the top of the other boiler, and that he also hurt his hips. The engineer, Cramer, in his testimony, disputed this version of the accident, and testified that he followed the conductor's signals and lowered the boiler properly; that it was going down between some other boilers, which cut off his view, so that he could not see the bottom of it, but it seemed to catch on something which made it tip, and made plaintiff slip, but he did not fall, or strike anything; that the boiler was lowered in the place selected by Weaver, the conductor, and apparently, through Weaver's mistake, struck a projection on the side of one of the other boilers, which was the cause of the tipping. He also testified that he was using the engine to lower the boiler, and that he lowered it at a safe speed if properly placed, and that it was the conductor's business to see that it was properly placed. The conductor, Weaver, was

discharged the same day, and the engineer, Cramer, was retained, and was still working for the defendant at the time of the trial.

The evidence shows that the plaintiff reported the second accident at the office, and was examined by the company's doctor, who testified that plaintiff complained only of a sore or sprained hip, and that he saw no external marks of injury. He nevertheless, as a precautionary measure, told the plaintiff to stay at home for a few days. The accident occurred May 31, 1911, and plaintiff returned to work June 2d, and continued to work continuously, with two days' absence during the entire month of June, and a few days in July, when he finally left defendant's employment.

As has already been said, the plaintiff made no claim on account of his first injury until after the occurrence of his second injury. At the trial plaintiff claimed that he had to cease work because he grew weak and had pains in his back and stomach, that he had since had an operation, which had improved his condition, but that he still was troubled with weakness and pains in the back. There was medical testimony introduced by both parties. The court held that the answers of the physicians to the hypothetical questions put to them raised a question of fact with respect to the connection between the injury, or injuries, and the disease, and submitted the case to the jury with respect to both injuries. The jury rendered a general verdict for the plaintiff for $1,250, presumably basing the verdict upon both of the claimed injuries, and a judgment for plaintiff followed.

The defendant brings the case here upon writ of error, and the principal errors assigned are directed to the refusal of the trial judge, either to direct a verdict for defendant in respect to both of the claimed injuries, or at least to charge the jury that plaintiff could not recover for both of them.

Appellant's claims relating to the first alleged injury may be summarized, in part, as follows:

(1c) "The extinguishment of the lantern was only remotely connected with the injury. It was followed by another independent intervening cause which could not reasonably be anticipated, viz.: Plaintiff's voluntary act in walking toward the approaching car after his lantern was extinguished. The only act of the defendant which had any causal connection with the injury was the placing of the weights near the track, and all claim for recovery on this ground was abandoned."

(1e) "After plaintiff's lantern was extinguished, he had ample time to seek a position of safety for the purpose of relighting it. By walking toward the crane without relighting it, he voluntarily created a new and increased risk, which was the real cause of his injury. This risk was assumed by him, and this conduct on his part constituted contributory negligence."

It is the further claim of the defendant that a verdict should have been directed in regard to the second injury for the following reasons:

(a) "There was no proof of incompetency on the part of Cramer. He was merely accused of being stubborn, unpopular, and hard to get along with."

(b) "Cramer's incompetency (if any) was not the cause of the injury. None of the eyewitnesses of the accident testified that the dropping of the boiler resulted from any of Cramer's particular characteristics which were the subject of criticism."

(c) "There was no proof of any knowledge on the part of defendant of any such conduct on the part of Cramer as would disqualify him for the work he was doing."

(d) "Cramer's incompetency (if any) was assumed by the plaintiff, first, because plaintiff had worked with him long enough to know all about him by actual experience, and, second, also because Cramer's general reputation (whatever it was) was notorious among the men working in the yard, so that plaintiff, having worked in the yard with him for more than a

year, was chargeable with constructive knowledge of the facts, even if he had no actual knowledge."

*(e)* "Plaintiff was guilty of contributory negligence in riding the boiler merely to save the trouble of climbing down from it."

Relating to the first injury, the defendant requested the court to charge the jury as follows:

(21) "The mere fact that plaintiff had never measured and may not have known the exact distance of the pile of weights from the track did not excuse him for failing to keep out of danger. In that case it was his duty to take no chances, and, if he did not know whether there was room between the pile of weights and the car, he should have kept away from that point."

(23) "If, after plaintiff's lantern went out, he could have stepped aside into a safe place and have lighted it again before going on with his work, then it was his duty to do so, and he was guilty of contributory negligence in continuing to walk toward the car without stopping to light his lantern."

These requests to charge were refused.

The evidence is clear that plaintiff had an abundance of opportunity, from his position, to have relighted his lantern.

It is the claim of defendant, with reference to the first alleged injury, that under the testimony of the plaintiff and the allegations of the declaration the plaintiff must recover, if at all, on the theory that he was hunting for the approaching car with a lighted lantern, and was injured because his lantern went out, so that he could not see the car, and not because the engineer could not see him; that as his first alternative he could have stepped to the east a few feet, and could have stood there in safety until the car passed. From this position he could have called to the engineer as the crane went by. The crane could not run faster than four miles an hour, and a man could walk ahead of it on the track in safety.

It is unnecessary to state the different courses of

conduct which were available to the plaintiff, at the time his lantern went out, to have preserved his safety, according to his own testimony. He could have walked away from the approaching car until he was south and beyond the point where it had been ordered to stop south of the diamond; he could have stepped aside to the crib near at hand, or to the place where the plates were sitting between the posts at his right for an opportunity to relight his lantern; he could have done many things in perfect safety, except the one thing which he did, namely: To place himself in the trap between the weights and rail just as the car approached. He knew that this trap existed, as shown by his testimony above quoted. Upon his own testimony, he set out to hunt for what he claims was a dangerous, moving car, already overdue, by walking along the track toward it when it was, as he claims, so dark that he could not see the car when it approached. If this did not constitute contributory negligence, it is difficult to state what would constitute such negligence. It is not necessary to cite our own cases holding that, where there is a comparatively safe and a more dangerous way of discharging a duty, it is negligent to select the more dangerous. Two of the latest cases to this effect are *Wight* v. *Railroad Co.*, 161 Mich. 216 (126 N. W. 414), and *Lukovski* v. *Railroad Co.*, 164 Mich. 361 (129 N. W. 707).

We agree with defendant's contention, also, that the extinguishment of the lantern was not the proximate cause of the plaintiff's injury. The extinguishment of the lantern was followed by another independent intervening cause which could not reasonably be anticipated, namely: Plaintiff's voluntary act in walking towards the approaching car, and between the weights and the track, after his lantern was extinguished. This, we think, was the proxi-

mate cause of the injury, and for this act defendant was not responsible.

We are clearly of the opinion that for these two reasons, without searching for others, the case, in so far as it related to the first alleged injury, should have been withdrawn from the consideration of the jury, and that defendant's requests above indicated should have been given. The record shows that the case was submitted to the jury upon the plaintiff's claim that he was entitled to recover for both injuries. This of itself was prejudicial error, and must result in a reversal of the case.

No question is raised in the record because the two causes of action were joined in one declaration. Probably this practice cannot be criticised as matter of pleading. The general rule seems to be that counts upon distinct and independent torts of the same nature, and upon which the same judgment may be given, may be joined; but, where both counts are submitted to the jury, and there is a general recovery upon both, and it turns out that one was erroneously submitted, it is equivalent to a mistrial, and a new trial must result.

Referring to the second alleged cause of action for the claimed injury of May 31, 1911, we would say that we have read the entire record with great care to discover whether or not the plaintiff, by his evidence, made out a case which entitled him to go to the jury, and, if so, whether or not there was reversible error upon the trial thereof, or in the manner in which the case was submitted. A perusal of the record discloses that, as to the second claim, there was a sharp conflict in the evidence upon nearly every material fact asserted by either party. Whether or not Cramer was either incompetent, unskillful, careless, heedless, or reckless was in dispute. Whether, if Cramer was either, plaintiff had knowl-

edge or notice for a sufficient time so that it could be said that he assumed the risk was in dispute, as well as whether such conduct was the proximate cause of plaintiff's injury. Also whether plaintiff was in his conduct guilty of contributory negligence presented facts upon which there was a sharp conflict. It was contended that plaintiff was guilty of contributory negligence because he was riding upon the crane. There was testimony tending to show, not only that it was proper for him to ride there, and that it tended to dispatch the work, but that he rode there in accordance with the custom, and with the permission, if not the direction, of the yard foreman, who seemed to have almost plenary power upon the premises. This was denied by the defendant. Under these circumstances, we think, the question of contributory negligence was one for the jury.

The charge upon this branch of the case was a careful one, and we have reached the conclusion that, in so far as the trial of the case related to the alleged second injury, there was no reversible error.

For the reasons above pointed out, however, the case must go back for a new trial, because it is impossible for us to determine what portion of the damages were awarded to the plaintiff for the alleged injury of November, 1909.

The judgment of the circuit court is reversed, and a new trial granted.

MCALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.